UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

MAR 2 2 2001

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

| | | |
|---|---|---|
| ALLEN V. SCHEINER, on Behalf of Himself And All Others Similarly Situated, | § § § | |
| PLAINTIFF, | § § | |
| v. | § § | CIVIL ACTION NO. 3-01-CV-418-H |
| i2 TECHNOLOGIES, INC., SANJIV SIDHU and WILLIAM M. BEECHER, | § § § § | |
| DEFENDANTS. | § | JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by i2 Technologies, Inc. ("i2" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the common stock of i2 between January 9, 2001 and February 26, 2001, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).   i2 maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Allen V. Scheiner, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of i2 at artificially inflated prices during the Class Period and has been damaged thereby.

7.      Defendant i2 describes itself as a provider of eBusiness solutions.   The Company's TradeMatrix product, a platform of business-to-business solutions, services, and marketplaces, purports to offer planning, procurement, commerce, fulfillment, customer care, retail, strategic sourcing and product development services.  The Company's executive offices are located at 11701 Luna Road, One i2 Place, Dallas, Texas 75234.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS

8.     Defendant Sanjiv Sidhu ("Sidhu"), at all times relevant to this action, served as the Company's Chairman and Chief Executive Officer.

9.     Defendant William M. Beecher ("Beecher"), at all times relevant to this action, served as the Company's Executive Vice President of Operations and Chief Financial Officer.

10.    The defendants referenced above in ¶¶ 8-9 are referred to herein as the "Individual Defendants."

11.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

12.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of i2, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading

statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

13.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

14.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with i2, each of the Individual Defendants had access to the adverse undisclosed information about i2's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about i2 and its business issued or adopted by the Company materially false and misleading.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS          PAGE 4

15.   The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.   Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

16.   Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of i2 common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme:   (i) deceived the investing public regarding i2's business, operations, management and the intrinsic value of i2 common stock;   (ii) enabled the Individual Defendants and other insiders to sell more than $97.67 million worth of their personally-held shares of i2 common stock at artificially inflated prices; and (iii) caused plaintiff and other members of the Class to purchase i2 securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of i2 between January 9, 2001 and February 26, 2001, inclusive (the "Class Period") and who were damaged thereby.   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of

their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

18.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, i2 common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by i2 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

19.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

21.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      a.     whether the federal securities laws were violated by defendants' acts as alleged herein;

      b.     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of i2; and

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS                                    PAGE 6

      c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

22.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background Facts

23.    i2 describes itself as a provider of eBusiness solutions.  The Company purports to provide supply chain management software.  Its products are purportedly used to plan and schedule manufacturing and related logistics, from raw materials procurement to customer delivery.

24.    i2's TradeMatrix product, a platform of business-to-business solutions, services, and marketplaces, purportedly offers planning, procurement, commerce, fulfillment, customer care, retail, strategic sourcing and product development services.   i2 also offers its RHYTHM software applications product which purportedly allows customers to model supply chains and generate integrated solutions to planning and scheduling problems.

25.    At all relevant times, Nike, Inc. ("Nike"), the world's largest seller of athletic footwear and athletic apparel, was a material customer of i2, who purchased i2's software products and services for use in its footwear division.  Unbeknownst to investors, Nike's

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS                         PAGE 7

implementation of i2's software was riddled with problems which necessarily put i2's relationship with Nike, a material customer, at risk. Moreover, i2's reputation would have been negatively affected and its sales likely negatively impacted had the problems with Nike been revealed.

26.    Then, on February 26, 2000, after the close of the market, Nike issued a press release revising its third quarter and fiscal 2001 earnings because of, among other things, "complications arising from the impact of implementing [its] new demand and supply planning systems" which were developed by i2. Specifically, Nike was forced to reduce its shoe sales by $80-$100 million because of problems that it had implementing a new i2 supply-chain management system which caused shortages of some products and overstocking of others. It is therefore clear that at all times during the Class Period, while defendants were issuing positive statements, as described herein, the Company was having material problems with its relationship with Nike and Nike's implementation of i2 software.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

27.    The Class Period begins on January 9, 2001, the first day of trading following i2's announcement after the close of the market on January 8, 2001, that its fourth quarter 2000 results were expected to exceed analysts' consensus estimates for revenues and earnings. The press release provided, in pertinent part, that:

> While the Company is still completing its review of results for the quarter, preliminary expectations are to report fourth quarter total revenues in excess of $370 million compared to consensus analyst estimates of $342 million, and bringing full-year 2000 revenues to over $1.1 billion. Management expects to report that license revenues for the fourth quarter and full year 2000 more than doubled over the same periods in 1999, due to strong sales of i2's

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS                            PAGE 8

leading e-business solutions. The Company also expects to report that operating income, excluding amortization of intangibles and non-recurring charges, strongly exceeded analysts' consensus estimates of $51 million. Additional details will be disclosed when the company reports full financial results next week.

28.    On January 17, 2001, i2 issued a press release announcing its financial results for the fourth quarter and full-year 2000, the periods ending December 31, 2000. The Company reported that revenues for the fourth quarter of 2000 increased 116% to $378 million versus $175 million for the fourth quarter of 1999. Revenues for the full-year 2000 increased to $1.1 billion, up 97% from the prior year. Defendant Sidhu commented on the results stating, in pertinent part, as follows:

> As proud as I am of our revenue results and achieving the $1 billion dollar milestone, I'm prouder still of the enormous value we are helping our customers create . . . . <u>Our customers have already achieved over $16 billion in growth and savings using our solutions, and will realize billions more in value each year from better planning, improved customer service, lower cost of goods sold, lower inventory and better asset utilization. We help our customers achieve higher productivity, fueling growth in their economies.</u> We are absolutely making a real difference in the world.
>
> * * * * *
>
> <u>We clearly haven't seen a slowdown in our business so far,</u> and we expect that our value proposition -- high ROI (return on investment) and quick payback -- positions us as a strategic investment to improve competitiveness even during slower economic growth.
>
> As companies become more concerned about improving their profitability, their competitiveness, their ability to satisfy their customers and their business velocity, i2's solutions represent one of the best investments they can make . . . . We have been saying this for a long time, and the proof of this statement is evidenced in our outstanding financial results for both this past quarter and the year. We're looking forward to our next significant milestone -- $5 billion in revenues -- with associated earnings. [Emphasis added.]

Defendant Beecher commented on the Company's earnings and prospects as well:

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS                             PAGE 9

i2 not only grew sales, but as planned, we grew margins faster. We have the number one position in our key markets. Our intellectual property is some of the richest and most difficult in the industry to replicate, and <u>we have a tremendous heritage of executing and delivering value.</u> [Emphasis added.]

29.    On January 18, 2001, <u>Bloomberg</u>'s Dylan Ratigan conducted an interview with

defendant Beecher regarding the Company's financial results and its operations. The

interview transcript, which was available on <u>Bloomberg Business News</u>, stated, in pertinent

part, as follows:

RATIGAN:    We want to get a sense from you as to why it is and to what you're attributing the utter and complete lack of your sense of a slowdown at i2 as you're surrounded by so many companies feeling just that?

BEECHER:    What i2 does is different.  i2, we are labeled in the B-to-B space, we provide the software that drives the capability companies need[] to do business.  So <u>our customers are Fortune 1000 customers type customers who are building out this new layer of infrastructure.  They come to us as a premier provider of solutions that address that need.</u>

        * * * * *

RATIGAN:    <u>What is the greatest hole in the Company right now?</u>

BEECHER:    <u>Just continuing to hire really strong people on the sales side of the business, the development side of the business.  The hiring market is strong.  We're an attractive company.  We keep going after the best people.</u> [Emphasis added.]

30.    The Company's pre-earnings announcement, its earnings release and its

subsequent conference call were followed by several analyst reports which spoke in highly

positive terms about the Company's performance and future prospects based on the detailed

guidance provided by defendants.  For example:

        (a)    On January 9, 2001, Dain Rauscher Wessels issued a report on i2 reiterating its "Strong Buy-Aggressive" rating on the Company's stock. Analyst K.G. Rangan wrote that "I2's results indicate continued strong

customer appetite for B2B solutions that deliver cost savings to the bottom line in a tougher macroeconomic scenario;"

(b) On January 9, 2001, Jefferies & Company, Inc. issued a report on i2 reiterating its "Buy" rating on the Company's stock;

(c) On January 9, 2001, UBS Warburg issued a report on i2 maintaining its "Buy" rating on the Company's stock;

(d) On January 9, 2001, U.S. Bancorp Piper Jaffray, Inc. issued a report on i2 reiterating its "Buy" rating on the Company's stock;

(e) On January 18, 2001, U.S. Bancorp Piper Jaffray, Inc. issued another report on i2 reiterating its "Buy" rating on the Company's stock and raising its estimates for the first quarter of 2001 and for the full-year 2001;

(f) On January 18, 2001, Jefferies & Company, Inc. issued another report on i2 reiterating its "Buy" rating on the Company's stock; and

(g) On January 18, 2001, Dain Rausher Wessels issued another report on i2 reiterating its "Strong Buy-Aggressive" rating on the Company's stock.

31.    Defendants' additional efforts at pushing i2 stock at this time included extensive press releases which trumpeted new sales, products and partnerships by the Company but failed to disclose the problems it was having with Nike.  For example:

(a) On January 16, 2001, i2 announced that Dillard's Inc. ("Dillard's") has purchased i2's e-business solutions to transform its forecasting processes and replenishment of basic stock items.  The press release stated:

"Dillard's, comprised of 340 store locations spanning 29 states, plans to tackle a challenge most high-volume retail stores face - how to provide merchandise that matches each individual store's specific demographic community. Dillard's will implement i2 TradeMatrix Demand Planner(TM), which is designed to provide Dillard's with the ability to more accurately forecast the items customers will want to buy in each geographic location. Every Dillard's store will be treated as

a unique entity, with forecasts based on each store's historic selling patterns.

i2's solutions are designed to help Dillard's meet another issue that challenges retailers - having too few of the items that are selling well and having too many of the items that are not selling. Dillard's will also implement i2 TradeMatrix Retail Replenishment Planner(TM), which is intended to assist retail chains such as Dillard's replenish each store only with the exact items, down to the color and size level, that are actually selling. Increased customer service and improved inventory productivity are just some of the benefits Dillard's expects to experience with installation of this product."

(b)    On January 16, 2001, i2 also issued a press release announcing the availability of an entire suite of solutions designed to optimize each phase of the supply chain.  The press release stated:

"i2's solution suites pull together information from throughout a company, as well as from suppliers and customers to provide a global view of what a company is buying, making and selling.  The solutions go beyond automating transactions to ensuring that the right transactions are made in the first place, from choosing what products to make and which supplies to use in making them, to finding the best ways to get products to customers.  <u>These new solutions have been integrated to provide the maximum value to customers - and are designed to enable i2 to reach its mission of providing at least $75 billion in value to its customers by 2005.</u> [Emphasis added.]"

(c)    On February 6, 2001, i2 also issued a press release announcing a partnership with QRS Corporation to integrate e-business solutions for the consumer goods and retail industry.  The press release stated:

"Through an integration of QRS' Tradeweave Retail Network with i2 TradeMatrix, we would develop a comprehensive tailor-made solution for our customers," said Terry Turner, i2 senior vice president, Consumer Goods and Retail. "We would then be providing our customers with a more efficient tool to aid them in strategically and effectively managing the retail decision making process."

(d)    On February 12, 2001, i2 issued a press release announcing a partnership with The New Health Exchange to develop a comprehensive online product catalog and content solution to serve the United States health care supply market. The press release stated:

"i2 is proud to be a part of this endeavor as NHX leads the way toward a highly-efficient health care supply chain," said Tom Cooper, executive vice president, i2. "We believe NHX is uniquely positioned to promote positive changes in the health care supply marketplace. Their successful efforts to standardize product data through the development of a universal product catalog will decrease the cost of moving and processing information across the supply chain and promote acceptance of industry-wide protocols."

(e) On February 26, 2001, before Nike made its announcement, i2 issued a press release announcing an alliance with Intel to accelerate deployment of i2's e-marketplace and supply chain management applications powered by Intel-based servers. The press release stated:

"Intel is the preeminent building block supplier for the Internet, communications, computing and services in the digital age," said Darryll Dewan, i2 group vice president. "The combination of i2's powerful TradeMatrix Solutions, coupled with Intel-based servers, empowers the end user to handle many operations while simultaneously managing the extended value chain. As companies come to rely more heavily on business processes done in real time, the need for next-generation computing power will continue to grow. The i2-Intel alliance is a logical choice for a company's success."

32. Beginning on January 21, 2001 and ending on January 31, 2001, the Individual Defendants, together with other i2 insiders, engaged in a massive insider selling campaign selling over 1.7 million shares of personally-held i2 common stock for gross proceeds of over $97.67 million.

33. On February 12, 2001, defendant Sidhu made a presentation at the Goldman Sachs Technology Symposium in La Quinta, California. In making his presentation, Sidhu highlighted his Company's products and told the audience that:

If you see a curve coming [in your business], you need to decide what to do. You need forward visibility and variability. That way, the moment there's a change in demand, it's felt throughout the supply chain faster and much more strongly.

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS

34.     The statements referenced above in ¶¶ 27-29, 31 and 33 were materially false and misleading because they failed to disclose certain material facts, including, <u>inter</u> <u>alia</u>:

(a)     that the Company was experiencing software implementation difficulties with Nike and that these problems were material and severe and were damaging the Company's relationship with Nike;

(b)     that in addition to the problems with Nike, the Company was experiencing implementation problems with other customers; and

(c)     based on the foregoing, defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

## THE TRUTH IS REVEALED

35.     On February 26, 2001, after the close of the market, the full extent of i2's problems became known to the public when Nike, one of i2's customers, issued a press release revising its third quarter and fiscal 2001 earnings because of, among other things, "complications arising from the impact of implementing [its] new demand and supply planning systems" which were developed by i2.

36.     i2 shareholders, upon hearing that Nike blamed its problems on i2 and i2's software, immediately caused the Company's stock price to collapse.  i2 stock opened on February 27, 2001, the first trading day after Nike's announcement, at $30.19 per share, from a previous close of $35.50.   By the end of the day, the stock closed at $27.56, down 22% from the previous day's close.

## Undisclosed Adverse Information

37.     The market for i2's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS

to disclose, i2's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired i2 securities relying upon the integrity of the market price of i2's securities and market information relating to i2, and have been damaged thereby.

38.   During the Class Period, defendants materially misled the investing public, thereby inflating the price of i2's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, including, inter alia:

> (a)   that the Company was experiencing software implementation difficulties with Nike and that these problems were material and severe and were damaging the Company's relationship with Nike;
>
> (b)   that in addition to the problems with Nike, the Company was experiencing implementation problems with other customers; and
>
> (c)   based on the foregoing, defendants' opinions, projections and forecasts concerning the Company and its operations were lacking in a reasonable basis at all times.

39.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about i2's business, prospects and operations. These material

misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of i2 and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## SCIENTER ALLEGATIONS

40.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding i2, their control over, and/or receipt and/or modification of i2's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning i2, participated in the fraudulent scheme alleged herein.

41.     While i2 insiders were issuing false and misleading statements about i2 and its business, the Individual Defendants, together with other i2 insiders, directly or indirectly, disposed of over $97.67 million worth of personally-held stock, benefitting from the artificial inflation in i2's stock price their fraudulent scheme had created. The Individual Defendants and other insiders sold shares during the Class Period as follows:

| William M. Beecher Chief Financial Officer, Vice President | | |
|---|---|---|
| <u>Date</u> | <u>Shares</u> | <u>Value</u> |
| 1/24/01 | 10,000 | $ 597,200.00 |
| 1/24/01 | 11,196 | $ 668,625.00 |
| 1/24/01 | 20,000 | $ 1,194,400.00 |
| 1/24/01 | 26,804 | $ 1,600,735.00 |
| 1/24/01 | 32,000 | $ 1,911,040.00 |
| Total | 100,000 | $ 5,972,000.00 |

| Gregory A. Brady President | | |
|---|---|---|
| <u>Date</u> | <u>Shares</u> | <u>Value</u> |
| 1/23/01 | 280,000 | $ 15,108,800.00 |
| Total | 280,000 | $ 15,108,800.00 |

| Pallab K. Chatterjee Officer | | |
|---|---|---|
| <u>Date</u> | <u>Shares</u> | <u>Value</u> |
| 1/24/01 | 250,000 | $ 14,897,500.00 |
| Total | 250,000 | $ 14,897,500.00 |

| Reagan L. Lancaster Divisional Officer | | |
|---|---|---|
| <u>Date</u> | <u>Shares</u> | <u>Value</u> |
| 1/23/01 | 50,000 | $ 2,750,000.00 |
| 1/25/01 | 40,000 | $ 2,300,000.00 |
| Total | 90,000 | $ 5,050,000.00 |

| Sanjiv S. Sidhu Chief Executive Officer and Chairman | | |
|---|---|---|
| <u>Date</u> | <u>Shares</u> | <u>Value</u> |
| 1/23/01 | 19,900 | $ 1,101,863.00 |
| 1/23/01 | 39,800 | $ 2,203,726.00 |
| 1/23/01 | 53,000 | $ 2,903,870.00 |
| 1/23/01 | 107,000 | $ 5,862,530.00 |
| 1/24/01 | 19,900 | $ 1,183,453.00 |
| 1/24/01 | 25,000 | $ 1,487,750.00 |
| 1/24/01 | 39,800 | $ 2,366,906.00 |
| 1/24/01 | 50,000 | $ 2,975,500.00 |
| 1/25/01 | 19,900 | $ 1,169,523.00 |
| 1/25/01 | 39,800 | $ 2,339,046.00 |
| 1/26/01 | 17,000 | $ 972,230.00 |
| 1/26/01 | 19,900 | $ 1,108,629.00 |
| 1/26/01 | 33,000 | $ 1,887,270.00 |
| 1/26/01 | 39,800 | $ 2,217,258.00 |
| 1/29/01 | 8,000 | $ 457,840.00 |
| 1/29/01 | 17,000 | $ 972,910.00 |
| 1/29/01 | 19,900 | $ 1,131,713.00 |

| 1/29/01 | 39,800 | $ | 2,263,426.00 |
|---------|--------|---|--------------|
| 1/30/01 | 19,900 | $ | 1,107,236.00 |
| 1/30/01 | 39,800 | $ | 2,222,432.00 |
| 1/31/01 | 7,000 | $ | 393,750.00 |
| 1/31/01 | 13,000 | $ | 731,250.00 |
| 1/31/01 | 19,900 | $ | 1,074,998.00 |
| 1/31/01 | 39,800 | $ | 2,149,996.00 |
| Total | 747,900 | $ | 42,285,105.00 |

| Sandeep R. Tungare Director | | |
|-----------------------------|---|---|
| Date | Shares | Value |
| 1/21/01 | 42,016 | $ | 2,310,880.00 |
| 1/23/01 | 6,344 | $ | 352,092.00 |
| 1/23/01 | 8,025 | $ | 442,418.00 |
| 1/23/01 | 10,084 | $ | 560,973.00 |
| 1/23/01 | 10,085 | $ | 557,196.00 |
| 1/23/01 | 13,446 | $ | 744,639.00 |
| 1/29/01 | 50,000 | $ | 2,850,000.00 |
| Total | 140,000 | $ | 7,818,198.00 |

| Hiten D. Varia<br>Divisional Officer | | |
|---|---|---|
| Date | Shares | Value |
| 1/23/01 | 26,075 | $ 1,428,649.00 |
| 1/23/01 | 34,800 | $ 1,877,808.00 |
| 1/23/01 | 60,000 | $ 3,237,600.00 |
| Total | 120,875 | $ 6,544,057.00 |

### Applicability Of Presumption Of Reliance:
### Fraud-On-The-Market Doctrine

42.    At all relevant times, the market for i2's securities was an efficient market for the following reasons, among others:

(a)    i2's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, i2 filed periodic public reports with the SEC and the NASD;

(c)    i2 regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    i2 was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each

of these reports was publicly available and entered the public marketplace.

43.     As a result of the foregoing, the market for i2's securities promptly digested current information regarding i2 from all publicly available sources and reflected such information in i2's stock price. Under these circumstances, all purchasers of i2's securities during the Class Period suffered similar injury through their purchase of i2's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of i2 who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

45.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

46.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) enable the Individual Defendants and other i2 insiders to sell more than $97.67 million worth of their personally-held shares of i2 common stock at artificially inflated prices; and (iii) cause plaintiff and other members of the Class to purchase i2's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

47.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for i2's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

48.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of i2 as specified herein.

49.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of i2's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about i2 and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of i2 securities during the Class Period.

50.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination

of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

51.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing i2's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

52.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of i2's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of i2's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired i2 securities during the Class Period at artificially high prices and were damaged thereby.

53.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that i2 was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their i2 securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

54.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

55.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation Of Section 20(a) Of**
**The Exchange Act Against Individual Defendants**

56.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

57.    The Individual Defendants acted as controlling persons of i2 within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and

dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

58.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

59.    As set forth above, i2 and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

(b)    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages

sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 21, 2001

Respectfully submitted,

Marc R. Stanley
Texas Bar No. 19046500
Roger L. Mandel
Texas Bar No. 12891750

STANLEY, MANDEL & IOLA, L.L.P.
3100 Monticello Avenue, Suite 750
Dallas, Texas  75205
214/443-4300
214/443-0358 (Fax)

MILBERG WEISS BERSHAD HYNES & LERACH LLP
Steven G. Schulman
Samuel H. Rudman
David A. Rosenfeld
One Pennsylvania Plaza - 49th Floor
New York, NY  10119
212/594-5300
212/868-1229 (Fax)

ABRAHAM & PASKOWITZ
Jeffrey S. Abraham
60 East 42nd Street, Suite 4700
New York, NY 10165
212/692-0555

**Attorneys for Plaintiff**

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS                                    PAGE 27

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

**Allen V. Scheiner**, hereby certifies that the following is true and correct to the best of my knowledge, information and belief:

1. I have reviewed the attached Class Action Complaint and have authorized counsel to file the complaint.

2. I did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. To the best of my knowledge, the following are all my transactions in I2 Technologies, Inc. common stock during the period between January 9, 2001 and February 26, 2001, inclusive: purchased 80 shares on January 17, 2001 at $53-15/16 per share.

5. I have sought to serve as a class representative in the following case brought under a provision of the federal securities laws in the last three years: Scheiner v. WorldCom, Inc. (S.D. Miss.).

6. I will not accept any payment for serving as class representative on behalf of the class beyond my pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

Signed under the penalties of perjury this ___ day of March, 2001.

_____
Allen V. Scheiner