**ORIGINAL**



NORT...                    COURT
NORT...        ...IC  OF TEXAS
                        ...D

MAY 2 3 2003

CL... ..., ...S. DISTRICT COURT

by _____
            Deputy

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| ALLEN V. SCHEINER, on Behalf of Himself and All Others Similarly Situated, | § § § | Civil No. 3:01-CV-418-H (Consolidated) |
| PLAINTIFF, | § § | |
| v. | § § § | |
| i2 TECHNOLOGIES, INC., SANJIV S. SIDHU, GREGORY A. BRADY and WILLIAM M. BEECHER, | § § § § | **CLASS ACTION** |
| DEFENDANTS. | § § § | **JURY TRIAL DEMANDED** |

## SECOND AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiffs, by their undersigned counsel, make the following allegations upon information and belief based upon all of the facts set forth below which were obtained through an extensive investigation made by and through their attorneys. Counsel's investigation has included, among other things, a review of: (i) the public filings of i2 Technologies, Inc. ("i2" or the "Company") with the Securities and Exchange Commission (the "SEC"); (ii) press releases and other public statements issued by defendants; (iii) published reports and news articles regarding the Company; (iv) the documents provided by i2 and certain third parties in discovery demands; and (v) confidential communications with certain former i2 employees and independent consultants. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth below after a reasonable opportunity for further discovery.

## NATURE OF THE ACTION

1.     This is a securities fraud class action on behalf of purchasers of i2 common stock between March 22, 2000 and January 27, 2003, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination of materially false and misleading information to the investing public, occurred in this District and i2 maintains its principal executive offices in this District.

5.     In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Lead Plaintiffs, as set forth in the attached Schedule A incorporated herein by reference, purchased i2 common stock during the Class Period at artificially inflated prices and were damaged thereby.

7.     On January 9, 2003, the Court issued an Order certifying Lead Plaintiffs Philip A. Anthony, Milson Lopes dos Reis, G.O. Morphew and Frederick W. Bradley as Class Representatives for a class consisting of all persons who purchased or otherwise acquired i2 common stock between May 4, 2000 and February 26, 2001 inclusive (the "Class Period"). Lead Plaintiffs will seek to expand the Class to the Class Period set forth herein of March 22, 2000 through January 27, 2003.

8.     Excluded from the Class are the defendants, members of the immediate families of the individual defendants (identified in paragraphs 10-14, below), any subsidiary, affiliate, or employer of any Defendant, or any entity in which an excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

9.     Defendant i2 is a Delaware corporation with its executive offices located at 11701 Luna Road, Dallas, Texas 75234. i2 describes itself as a leading provider of e-business and marketplace software solutions that may be used by enterprises to optimize business processes both internally and with their trading partners. i2's products include software applications for supply chain management, supplier relationship management and customer relationship management.

10.     Defendant Sanjiv S. Sidhu ("Sidhu"), at all times relevant to this action, served as the Company's Chairman and Chief Executive Officer.

11.     Defendant Gregory A. Brady ("Brady"), at all times relevant to this action, served as the Company's President.

12.     Defendant William M. Beecher ("Beecher"), at all times relevant to this action, served as the Company's Executive Vice President and Chief Financial Officer.

13.     Defendant Nancy F. Brigham ("Brigham") was, at times relevant to the allegations herein, i2's Controller.  Defendant Brigham signed several of the filings submitted by i2 to the SEC throughout the Class Period as i2's principal accounting officer.

14.     Defendant David C. Becker ("Becker") is, and was at times relevant to the allegations herein, i2's Vice President-Finance & Accounting.  Defendant Becker signed several of the filings submitted by i2 to the SEC throughout the Class Period as i2's principal accounting officer.

15.     The individual defendants referred to in ¶¶ 10-14 above are referred to herein as the "Individual Defendants" and collectively with the Company as "Defendants."

16.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's performance, operations, business, products, markets, management and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent

-4-

their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the misrepresentations contained therein. The Individual Defendants are also liable as controlling persons of the Company. As set forth in the Form 10-Q filed by the Company on or about August 14, 2000, among other filings made by the Company, "[The Company's] executive officers and directors together beneficially own approximately 37% of the total voting power of our company. Accordingly, these stockholders will be able to determine the composition of our Board of Directors, will retain the voting power to approve all matters requiring stockholder approval and will continue to have significant influence over our affairs."

18.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, corporate press releases and other public statements as alleged herein were the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of i2, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations and products, as alleged herein. The Individual Defendants were also directly involved in making, drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of i2 common stock by disseminating

materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding i2's business, operations, products and the intrinsic value of i2 common stock; (ii) deceived the investing public regarding the true condition of i2's revenues and assets; (iii) enabled the Individual Defendants to sell $489,102,835.19 of their personally-held shares of i2 common stock at artificially inflated prices; and (iv) caused Lead Plaintiffs and other Class members to purchase i2 securities at artificially inflated prices.

## UNDISCLOSED MATERIAL INFORMATION

20.     i2 describes itself as a leading provider of e-business software solutions that may be used by companies to optimize their business processes both internally and among trading partners. i2's products, marketed as TradeMatrix software, include software applications for supply chain management, supplier relationship management and customer relationship management. For example, i2's Supply Chain Planner software application is marketed as software that determines the quantity and timing of production, purchasing and transportation to optimally match demand to supply based on dependencies between production plants, suppliers and any other defined constraints. i2's Demand Planner software application is marketed as software that is designed to provide a multi-dimensional view of projected demand for a service or product based on a set of algorithms and previous demand levels.

21.     Throughout the Class Period, as set forth below, Defendants described i2's TradeMatrix software as an "integration solution" capable of working with "any back-end transaction system" and offering "standard integration" to a variety of computer systems, which features and capabilities purportedly differentiated TradeMatrix from other software systems offered by i2's competitors who "struggled" with implementation issues. In truth, i2's TradeMatrix software was not an integrated package as represented by Defendants, but a series of software application

programs which had to be individually integrated with both each other and with the customer's existing computer systems, on a project-by-project basis, during implementation procedures in order to achieve any of the software's promised interoperability and functionality. Further, as set forth below, in recognizing revenue from the sale of this software, Defendants violated Generally Accepted Accounting Principles ("GAAP") in failing to account for the extensive integration work needed for the software. Given their positions and responsibilities within the Company, each of the Individual Defendants had direct knowledge of or recklessly ignored these facts in describing the software during the Class Period.

22.     Among other things, the individual software application programs sold by the Company as part of its "integrated" TradeMatrix solution are not designed to work together or share information because they operate on hierarchal databases or "flat" files which makes the sharing of data extremely difficult and complex (as opposed to relational databases where common points of data are routinely shared). For example, although i2's Demand Planner and Supply Chain Planner software applications are supposed to work together as part of i2's "integrated" software solution (and it is essential for the customer that they do so), Demand Planner cannot share data or work with Supply Chain Planner absent time consuming manual processes, where data is literally downloaded from Demand Planner into hundreds or thousands of files and supporting files and then manually re-loaded into Supply Chain Planner. These manual processes consume as much as six to ten hours of a full staff of programmers, quality assurance personnel, technicians and business representatives, each time the software applications are required to share data, which is as often as weekly. All of these procedures would not be required if the i2 software was integrated as described by Defendants. Similarly, although it is necessary for the following software applications to share data, each of the following i2 software applications, among others, are not integrated with each other and cannot

-7-

routinely share data: Supply Chain Strategist and Supply Chain Planner; Production Scheduler and Factory Planner; Transportation Optimizer and Supply Chain Planner; and Product Sequencer and Factory Planner. Many of these i2 software applications, even if used as stand alone products (such as Supply Chain Planner or Demand Planner), are extremely complex to install and require high levels of configuration to be implemented and operate successfully in commercial environments. All of these circumstances caused the implementation of i2's TradeMatrix software to be complex, time-consuming (taking an average of one to two full years for implementation), expensive and, in numerous undisclosed cases, unsuccessful. As a result, customers often complained that i2 oversold its TradeMatrix software and provided them with software that did not work as described during sales presentations.

23.     i2 employees were aware of these undisclosed complaints and the Company's practice of selling customers on capabilities of TradeMatrix software that did not exist, leaving it up to the i2 implementation teams to do their best to make the software work as promised. As a result, i2 employees often joked internally that i2's TradeMatrix software ran best on PowerPoint or slide presentations used at the Company's sales pitches to prospective new customers and that the Company sold "slide"ware and not software. i2's business development representatives also complained in internal weekly meetings that i2's sales teams oversold i2's TradeMatrix software and were making "false promises" to customers which the Company could not keep. At the same time, i2's sales force was instructed never to say "no" to a potential customer's inquiries about the software's capabilities, even if the requested capabilities did not exist.

24.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

**25.** ███████████████████████████████████

26.      Indeed, while Defendants were making their numerous Class Period representations about the software's purported capabilities, they were each aware of and failed to disclose a number of adverse, material problems with the integration of i2's TradeMatrix software with numerous major customers whose names appeared in press releases and SEC filings issued by the Company.  These customers included, among others, Nike, Inc. ("Nike"); Kmart Corporation ("Kmart"); Motorola, Inc. ("Motorola"); Amazon.com, Inc. ("Amazon.com"); Occidental Chemical Corporation ("Occidental"); Frito-Lay, Inc. ("Frito-Lay"); Seagate Technology, Inc. ("Seagate"); Compaq Computer Corp. ("Compaq"); and Polo Ralph Lauren Corporation ("Polo").

27. Defendants' failure to disclose the complexity, time and expense associated with the implementation and integration of i2's TradeMatrix software, while falsely describing the software as an "integration solution" capable of working with "any back-end transaction system" and offering "standard integration" to a variety of computer systems, resulted in material deception of the investing public.

28. Only _after_ Nike announced the material, ongoing problems it was experiencing with its implementation and integration of i2's TradeMatrix software, did Defendants begin to include the following warning in the Company's public filings with the SEC:

> IMPLEMENTATION OF OUR PRODUCTS IS COMPLEX, TIME-CONSUMING AND EXPENSIVE AND CUSTOMERS MAY BE UNABLE TO IMPLEMENT OUR PRODUCTS SUCCESSFULLY OR OTHERWISE ACHIEVE THE BENEFITS ATTRIBUTABLE TO OUR PRODUCTS.
>
> Our products must integrate with the many existing computer systems and software programs of our customers. This can be complex, time-consuming and expensive, and may cause delays in the deployment of our products. Our customers may be unable to implement our products successfully or otherwise achieve the benefits attributable to our products.

29. This disclaimer (although not at all complete) was not made by Defendants throughout the Class Period and did not appear in connection with any of Defendants' repeated claims during the Class Period regarding the purportedly unique capabilities of i2's TradeMatrix software to integrate with customers' existing computer systems.

30. The severe problems encountered by Nike with its implementation and integration of i2's software that are set forth below demonstrate the material facts not disclosed by Defendants that were necessary to make their repeated Class Period statements regarding Nike and/or i2's TradeMatrix software complete and accurate when made.

## THE NIKE IMPLEMENTATION PROBLEMS

31.     On May 4, 2000, Defendants included a statement in the Company's Annual Report which stated, in the present tense, that Nike, the world's largest athletic shoe company, was already using i2's TradeMatrix software to improve its operations.  In fact, at the time that statement was made and the Company's Annual Report was disseminated, as each of the Defendants knew, the i2 software purchased by Nike was not yet integrated into Nike's operations or being used by Nike as represented.  As of that time and thereafter, Nike and i2 employees were encountering numerous, material problems attempting to integrate the various TradeMatrix software applications that Nike had purchased from i2, both with each other and with Nike's existing computer systems.  As a result, the i2 software did not go "live" at Nike or begin processing actual data until June 2000, well after Defendants' statement was made.  Nonetheless, the integration problems persisted, and by November 2000, each of the Individual Defendants was aware that the software had caused severe operational consequences for Nike, including specifically, duplicate factory orders for millions of pairs of shoes for which Nike did not have demand and the failure to order up to $100 million of shoes which were in high demand.  Nonetheless, in December 2000 (as set forth below), i2 senior Vice President Terry Turner again discussed the i2-Nike relationship in a highly positive light, without disclosing any of the known implementation difficulties and adverse results already experienced by Nike as of that time, which were necessary to make Turner's statements on behalf of the Company complete and accurate when made.

32.     The i2-Nike relationship began in early 1999.  At that time, Nike began ordering $400 million of computer software that was expected to greatly enhance planning, processing, tracking and shipping of its products.  Among the software selected by Nike was i2's TradeMatrix software, including the following applications of that software:  Supply Chain Planner, Demand

-11-

Planner, Collaboration Planner and Production Scheduler. As noted above, these TradeMatrix software applications did not go "live" or begin processing actual data for Nike's operations until June 2000. Prior to that time, Nike (through its managers who ran the i2 implementation, including John Richards (the project manager for Nike), and Nike's global supply chain director, Gordon Steele) made numerous complaints to i2, specifically to Individual Defendants Sidhu and Brady, regarding the software's implementation and functionality. Among other complaints, Nike complained that i2 "oversold" its TradeMatrix software, particularly in representing to Nike that the different software applications purchased by Nike, including Collaboration Planner, Supply Chain Planner and Demand Planner, were integrated and would work easily together when that was not true. In fact, during the implementation Nike discovered that these i2 software applications did not operate under common rules, could not routinely share information, had different ways of storing, reading and writing data (that is, data stored in different data formats) and required time consuming programing changes which substantially delayed Nike's implementation of i2's software. Nike also complained that the Supply Chain Planner software was unable to communicate with Nike's existing computer systems and often crashed when communicating with Nike's existing systems. Other complaints included that the i2 software needed to be highly customized to operate with Nike's existing systems and that changes to the i2 software caused the software's operation to be too slow, so that it took as long as two minutes for computer screens to appear on Nike's system and 30 seconds to one minute for a single change in data or entry to be recorded by the software. In addition, Nike complained that i2's software could only take advantage of one central processing unit ("CPU") while Nike's computer hardware employed multiple CPUs. Nike also complained that i2's Demand Planner software application could not process all of the product numbers or stock keeping units ("SKU"s) required by Nike. During this time period, defendant Brady, among other

senior i2 executives, personally attended meetings held at Nike's facilities to address Nike's complaints about the software's functionality and implementation. Given the importance of the Nike account and the Individual Defendants' direct personal responsibilities and interaction with Nike prior to and during the Class Period, each of the Defendants were well aware of Nike's complaints and difficulties with the implementation of the TradeMatrix software or recklessly ignored those complaints and difficulties in making their Class Period statements.

33.

**34.** ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

35. Despite the delayed implementation, i2's software severely malfunctioned when it finally went "live" in June 2000, as a result of the software's inability to integrate with Nike's existing computer systems and with its own various applications. Specifically, the Demand Planner and Supply Chain Planner software applications (which could not routinely share data or query each other) sent flawed data to Nike's contract manufacturers in Asia for Nike's Spring 2001 line which resulted in double orders for millions of shoes in poor demand and, at the same time, the software failed to place sufficient orders for certain, popular shoe models. These errors were caused by i2's software's inability to integrate with Nike's existing computer systems as well as the software's inability to share data among its own various applications. Among other things, when Nike data was uploaded on to Demand Planner from Nike's three major and numerous other minor computer systems, Demand Planner only processed the last data record it received for any given product. This resulted in inconsistent, incomplete and unreliable data. Thereafter, when the same data was uploaded on to Supply Chain Planner, that software application processed different data records for the same products, leading to further inconsistencies and errors. Demand Planner also "dropped" or lost Nike ordering data within six to eight weeks from when it was entered, making it impossible for planners to recall what they had asked each factory to produce. This forced Nike to accept all shoes produced whether or not they were ordered. i2 software also failed to "lock out" previously

-14-

committed factory orders recorded by Nike. As a result, when the factories received updated ordering plans from Nike, the plans incorrectly showed that the factories needed to make more shoes than Nike had requested, ignoring orders for which Nike already had commitments. As a result of these integration errors, Nike wound up accepting 5 million pairs (or $90 million worth) of poorly selling shoes for which it had no demand and was faced with a $80-100 million shortfall of shoes in strong demand.

36.    By November 2000, Defendants were each aware of these material problems as they participated in i2's efforts to create technical "workarounds" to avoid a reoccurrence of these massive ordering errors. These efforts were substantial and involved more than 50 i2 employees (plus additional Nike employees and independent consultants) working on the Nike project full-time. Among other things, i2 and independent computer consultants retained by Nike attempted to create alternate databases in order to bypass certain applications of the i2 software, as well as customized bridges to allow i2's various software applications to share data. At the same time, Nike and its independent consultants designed a manual, time-consuming weekly procedure designed to share data between i2's Demand Planner and Supply Chain Planner software applications, whereby data was downloaded from Demand Planner on to thousands of files and supporting files, and checked and re-loaded into Supply Chain Planner on Friday afternoons. This manual process consumed as much as six to ten hours of a full staff of programmers, technicians and Nike business representatives. Nike also created "Short-Term and Long-Term Data Solution Planner" groups to deal with the data problems created by the i2 software implementation, which included duplicate, incorrect, inconsistent, missing and lost data. These groups attempted to recover and realign the data so that the underlying Nike data would be accurately portrayed. Despite these serious problems in the Nike implementation and integration, in December 2000, senior i2 Vice President Terry Turner

again discussed the i2-Nike relationship in a highly positive light, without disclosing the known implementation difficulties and adverse results already experienced by Nike which were necessary to make Turner's statements on behalf of the Company complete and accurate when made.

37.    As set forth below, on February 26, 2001, Nike publicly announced that as a result of its software implementation problems, it would miss analysts' earnings estimates by as much as 30%. Nike's disclosure was the first public disclosure of its problems with i2 software and, resulted in an immediate decline in the price of i2 common stock. Thereafter, i2's reported results continued to decline as other potential i2 customers learned about the Nike experience and other failed or troubled i2 implementations and began questioning i2's sales representations. In June 2001, Nike began replacing i2's software for its Canada and United States markets, where the majority of the problems occurred with SAP and Oracle software.

## OTHER CUSTOMER PROBLEMS

38.    During the Class Period, Kmart also experienced undisclosed, material problems with i2's TradeMatrix software. Among the TradeMatrix software applications purchased by Kmart was Collaboration Planner. It was represented to Kmart by i2 that this software application would permit Kmart to communicate with all of its vendors and process all of the product numbers or SKUs associated with those vendors. In fact, the software was not capable of processing a sufficient number of SKUs. Kmart discontinued its use of Collaboration Planner in March 2001. Defendants were each aware of these facts, as Kmart represented a major new account for the Company, with Individual Defendant Sidhu, the Company's CEO, personally responsible for the Kmart project.

39.    Prior to the start of the Class Period, Motorola also experienced material problems with the Company's software. By the start of the Class Period, Motorola had discontinued its entire relationship with i2 as a result of undisclosed problems Motorola experienced with i2's software's

inability to integrate with and process all of its data. As a result of these problems, Motorola employees also charged the Company's sales force with overselling its software. In addition, Amazon.com, a major i2 customer, was never able to successfully use i2's Demand Planner software despite numerous hours of attempted integration work and eventually stopped using the system altogether as of January 2001. Prior to the start of the Class Period, Seagate also terminated its use of i2's software after i2 failed to meet its sales promises regarding implementation and functionality. All of these problems suffered by i2's "flagship" customers were known to or recklessly disregarded by Defendants and never disclosed to the investing public by them in connection with their numerous Class Period statements about the software's purportedly unique integration capabilities. Rather, as set forth below, during the Class Period, Defendants made numerous, materially false and misleading statements about the Company's software that were not corrected until after Nike's February 26, 2001 disclosure. Defendants were well aware of or recklessly disregarded all of these implementation and integration problems, among others suffered by other i2 customers. In fact, i2 maintained a confidential Intranet Lotus Notes database accessible to all of the Individual Defendants which contained detailed information on the Company's customer implementation problems (input by the i2 implementation team responsible for the projects) which could be sorted by customer name (e.g., Nike), customer industry (e.g., consumer goods) or i2 software application sold (e.g., Supply Chain Planner). The name of this Lotus Notes file was "CUSTINFO.NSF."

40.  ████████████████████████████████████████████
████████████████████████████████████████

41.  ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████



42.

**43.**



**44.**

## DEFENDANTS' DECEPTIVE ACCOUNTING PRACTICES

45.    In addition to issuing materially false and misleading statements regarding the integrated nature of i2's software and the failure to disclose the significant problems i2 was facing in installing the systems throughout the Class Period, i2 also was able to prolong the illusion of strong revenue and earnings growth, which, in fact, did not exist, by deliberately engaging in various types of improper accounting, including, among other things, violations of GAAP, as documented in detail herein.

46.    Over a period of four years, Defendants published materially false financial statements regarding i2 for the fiscal years ended December 31, 1999, December 31, 2000 and December 31, 2001. These statements materially inflated i2's revenues and account receivables, and

caused the price of i2 common stock to be significantly inflated or distorted during the Class Period. These statements were made in knowing and purposeful violation or reckless disregard of controlling revenue recognition requirements under GAAP and the disclosure requirements of the federal securities laws. These materially false and misleading financial statements were included, as discussed elsewhere herein, in the Company's regular, periodic filings with the SEC.

47.    On November 14, 2002, i2 filed its Form 10-Q for the quarterly period ended September 30, 2002 (the "November 2002 Form 10-Q"). In the November 2002 Form 10-Q, Defendants, for the first time revealed problems they knew or should have known about i2's accounting processes. The November 2002 Form 10-Q states:

> We and certain members of our board of directors have received a series of communications from two of our former officers containing <u>a variety of allegations generally related to: accounting and revenue recognition; inadequate financial controls; and gross negligence or potential fraud in connection with product and customer problems, acquisitions, public disclosure and other management decisions.</u>
>
> Prior to sending the initial correspondence in the series described above, each of the former officer had made claims against us seeking monetary relief. The claims by one officer have been settled. The claim by the other officer, in which he alleged that he is entitled to at least $3 million from us arising from our acquisition of his former company, remains unsettled. In addition, we understand that the two former officers are partners in a business venture which may be competitive with us.
>
> Our board of directors directed its audit committee to investigate the initial allegations promptly after they were received. The audit committee, comprised solely of independent directors, engaged separate legal and accounting advisors to assist with the investigation. The audit committee completed the investigation and reported its findings to our board of directors in the third quarter of this year. Based on the results of the audit committee's investigation, our board of directors concluded that there were no adjustments necessary to our financial statements, that there were no indications of material deficiencies in our financial controls and that the facts did not support the allegations concerning gross negligence or potential fraud.
>
> In September and October 2002, the two former officers brought additional information to the attention of the audit committee in respect of their prior allegations regarding revenue recognition. <u>A review of this additional information was performed and, as a result of that review, our management believes that the revenue recognition allegations remain unsubstantiated by the additional</u>

<u>information.</u> Our Management has preliminarily reviewed its findings with the audit committee which in turn has directed management to review those findings with the separate accounting advisors engaged by the audit committee to investigate the initial allegations. Following such review, the audit committee will receive a report from its separate accounting advisors and, if appropriate, will direct the separate accounting advisors to conduct an additional inquiry and analysis. [Emphasis added.]

48.    Following i2's statements that there was no merit to its former officers' assertions of

accounting fraud, i2's stock increased from $1.15 to $1.20 on November 15, 2002, an increase of

more than 14%.

49.    However, on January 27, 2003, i2 announced that:

[T]he audit committee of its board of directors has engaged Deloitte & Touche LLP, the Company's current external auditors, to re-audit the company's financial statements for the years ended December 31, 2000 and 2001. This decision was made at the recommendation of management based on recent information developed during the audit committee's ongoing investigation of certain allegations regarding the company's revenue recognition with respect to certain customer contracts and its financial reporting for those years. This decision was also influenced by the unavailability of Arthur Andersen LLP, the company's external auditor for those years, to consider any restatement that might be necessary. Deloitte & Touche replaced Arthur Andersen as the Company's external auditor in May 2002. The company has notified the SEC of these allegations, and the staff has opened an informal inquiry into these matter.

<u>As material adjustments to the previously reported financial statements may be required, investors should not rely on the financial information contained in the company's annual reports of Form 10-K for the years ended December 31, 2000 and 2001 or in the company's quarterly reports on Form 10-Q for the quarters ended March 31, 2000 through September 30, 2002</u>. While there can be no assurance, the company is working towards a goal of having the re-audit of the 2000 and 2001 financial statements, as well as the audit of the 2002 financial statements, completed to allow for the timely filing of the Company's 2002 annual report on Form 10-K. [Emphasis added.]

50.    i2's disclosure of possible improper revenue recognition caused i2's stock price to

drop sharply, falling $.34 cents, or 27%, to close at $.92 on January 27, 2003.

51.    On March 31, 2003, i2 issued a press release stating that it:

[W]ould delay filing its annual report on Form 10-K for the year ended December 31, 2002. The delay results from the Company's previously announced decision to re-audit its financial statements for the years ended December 31, 2000 and 2001 <u>as well as the Company's recent determination to expand the re-audits to include its financial statements for the year ended December 31, 1999.</u>

While the re-audits have not been completed and i2 cannot be certain of their eventual outcome with regard to amounts or periods affected, <u>the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000 and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002,</u> or in the Company's preliminary results for the fourth quarter of 2002. [Emphasis added.]

52.     In that press release, i2 also informed the market that it was the "subject of a formal investigation by" the SEC.

**DEFENDANTS' FINANCIAL STATEMENTS
DURING THE CLASS PERIOD WERE
MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP**

53.     At all relevant times during the Class Period, Defendants represented that i2's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of i2's stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its balance sheet and to falsely report income and expenses in the interim quarters and fiscal years during the Class Period.

54.     i2's materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding i2's actual operating results. Specifically, as discussed in paragraphs 57-88, below, Defendants caused the Company to violate GAAP because Defendants:

-22-

(I)     engaged in a series of improper practices in violation of GAAP that caused i2 to recognize improperly hundreds of millions of dollars of revenue; and

(ii)    failed to properly account for hundreds of millions of dollars of uncollectible receivables.

55.    *First*, i2, in violation of GAAP, Defendants used a variety of means to improperly recognize and report revenues:

(a)    i2 improperly recognized revenue on the shipment of software that it knew would require substantial time and cost to implement;

(b)    i2 improperly recognized revenue on the shipment of software that it knew would be returned or exchanged; and

c)    i2 improperly recognized revenue prior to the expiration of the date by which customers were permitted to return software.

56.    *Second*, i2 failed to account or sufficiently reserve for hundreds of millions of dollars of highly questionable or uncollectible receivables that were caused by the substantial problems i2 was having with its software installation and integration as described above.

### Improper Revenue Recognition

57.    GAAP, as described by FASB Statement of Concepts ("Concepts") No. 5, provides that the recognition of revenue should occur only where two fundamental conditions are satisfied: the revenue has been earned; and the amount is collectible. Concepts Statement No. 5, ¶¶ 83-84. Moreover, Concepts Statement No. 5 generally provides that revenues should *not* be recognized until they are: (i) realized or realizable; and (ii) earned. Concepts Statement No. 5, ¶ 83. These conditions for revenue recognition ordinarily are met when assets or services are exchanged for cash or claims to cash, and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Concepts Statement No. 5, ¶ 83. GAAP also provides

-23-

that profit is deemed to be realized when the collection of the sales price is reasonably assured. Accounting Principles Board ("APB") Opinion No. 10, ¶ 12.

58.     Similarly, the SEC's Staff Accounting Bulletin ("SAB") No. 101, which sets forth the SEC Staff's views in applying GAAP to revenue recognition in financial statements, imposes the same prerequisites to the recognition of revenues as does Concepts No. 5.

59.     According to i2's Form 10-K for the fiscal year ended December 31, 2000, i2 "Revenues consist of software license revenues, service revenues, and maintenance revenues, and are recognized in accordance with Statement of Position ('SOP') 97-2, 'Software Revenue Recognition,' as modified by SOP 98-9, 'Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions,' and SEC Staff Accounting Bulletin (SAB) 101, 'Revenue Recognition.'"  However, in many instances, because of the complexity of the installation, the software was not functional, and in some instances was never functional, and as a result was not accepted by the customers. In circumstances, where the complexity of the installation would require customer acceptance, i2 was precluded from recognizing the revenue until customer acceptance occurred.  Indeed, SOP 97-2 ¶ 20 states, "[a]fter delivery, if uncertainty exists about customer acceptance of the software, license revenue should not be recognized until acceptance occurs."

60.     As a seller of software based products and services, i2's transactions were subject to the AICPA's SOP 97-2. SOP 97-2 permits the recognition of revenues from the sale of software products only if the following criteria are met: (i) persuasive evidence of an arrangement exists; (ii) delivery has occurred; (iii) the vendor's fee is fixed or determinable; and (iv) collectibility is probable. SOP 97-2, ¶ 8 (emphasis added). SOP 97-2 further provides that "any extended payment terms in a software licensing agreement may indicate that the fee is not fixed and determinable." SOP 97-2, ¶ 28 (emphasis in original); see also SOP 97-2, ¶¶ 27, 29-30.

61.     As noted herein, in the years ending December 31, 1999, 2000 and 2001 and the respective quarters therein, i2 improperly recorded and reported hundreds of millions of dollars in revenues on sales to customers despite the fact that those customers were purchasing software based upon i2's assertions of performance and completion of installation and that they would not pay i2 in full or in substantial part for the products until the software was properly installed and running. Thus, the revenues from those sales were not fixed and determinable and were known to be at the time recognized uncollectible, *i.e.* collectibility was not probable.

62.     Throughout the Class Period, i2 improperly recorded revenues from software licensing arrangements, and thus i2 violated GAAP in connection with its software contracts by prematurely recognizing revenue on these and other transactions whereby there were still significant contingencies or yet-to-be-fulfilled obligations by the Company.  SOP 97-2 requires that if the software being licensed requires significant production, modification, or customization or any of the above four criteria are not present the company may not recognize revenue from the software or software system at the time of the transaction but instead must apply contract accounting.  Where the software transaction contains multiple-elements (i.e., software, upgrades/enhancements and/or consulting services) SOP 97-2 provides guidance concerning when the software license component may be considered a separate element and thus permit the company to recognize some revenue at the time of the transaction. SOP 97-2 provides that when an arrangement contains multiple-elements, the company must also assess whether the services being sold as part of the arrangement are considered by the customer to be integral to the functionality of the software product license component.  If the company determines that the service component of the arrangement is integral to the functionality of the software license component, the company must apply contract accounting. Each of i2's software products, as set forth above, involved "significant modification" to original

-25-

software code as required by the specific contracts, and thus were governed by SOP 97-2 and SOP 81-1. i2's software regularly and routinely required complex installation and modification of the database and in all instances should have used contract accounting as described in SOP 97-2 and 81-1. As a result, i2 was required to recognize revenue on a percentage-of completion-basis, rather than when the software was delivered.

63.     Generally for accounting purposes, product revenue is recognized immediately, while revenue from services is recognized as the services are provided. Consistent with SOP 97-2, in a transaction with software and service elements, revenue is recognized on the software only if the software sale is separable from the sale of services and only after revenue attributable to the service element is deducted. In a number of transactions, i2 improperly (i) separated product license sales from service elements, and/or (ii) characterized revenue in multiple element transactions as product or software revenue and recognized it at the time of the transaction. For example:

64.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████

65.     ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████



66.

67.

68.



69.

70.

71.     As a result, not only were i2's revenues and earnings materially inflated throughout the Class Period, but representations of conformance with SOP 97-2 and GAAP made by the Company were materially false and misleading when made.

72.     As a result of these materially fraudulent accounting practices and false public statements, the price of i2's securities was artificially inflated and distorted throughout the Class Period.

-28-

73.     In engaging in these practices, Defendants also caused i2 to violate the Company's own internal revenue recognition policies, which, according to i2's Form 10-K for the fiscal year ended December 31, 1999 and filed with the SEC on March 22, 2000, required that collection be reasonably assured prior to recognition:

> Our revenues consist of software license revenues, service revenues and maintenance revenues. Software license revenues consist of sales of software licenses which, <u>for periods subsequent to December 31, 1997, are recognized in accordance with the American Institute of Certified Public Accountants' Statement of Position ("SOP") 97-2, "Software Revenue Recognition."</u> Under SOP 97-2, software license revenues are recognized upon execution of a contract and delivery of software, provided that the license fee is fixed and determinable, no significant production, modification or customization of the software is required and collection is considered probable by management. [Emphasis added.]

i2, however, had not complied with SOP 97-2, instead recognizing revenue earlier than allowed under GAAP.

**Violations of SEC Regulations**

74.     Item 7 of the 2002 Form 10-K and Item 2 of Form 10-Q, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") requires the issuer to furnish information required by Item 303 of Regulation S-K [17 C.F.R. 229.303]. In discussing results of operations, Item 303 of Regulation S-K requires the registrant to:

> [d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.

The Instructions to Paragraph 303(a) further state:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . .

-29-

75.     In addition, the SEC, in its May 18, 1989 Interpretive Release No. 34-26831, has indicated that registrants should employ the following two-step analysis in determining when a known trend or uncertainty is required to be included in the MD&A disclosure pursuant to Item 303 of Regulation S-K:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and is reasonably likely to have a material effect on the registrant's financial condition or results of operations.

76.     The MD&A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.  As the Securities Act Release No. 6711 states:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company . . .

77.     Sec. 229.303   (Item 303), Management's discussion and analysis of financial condition and results of operations, states:

> To the extent that the financial statements disclose material increases in net sales or revenues, provide a narrative discussion of the extent to which such increases are attributable to increases in prices or to increases in the volume or amount of goods or services being sold or to the introduction of new products or services.

78.     According to Securities Act Release No. 6349, n.5, at 964:

> [i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

79.     Nonetheless, i2's Class Period Forms 10-K and 10-Q failed to disclose that the increases in revenues and earnings during the Class Period were the result of (I) improper revenue

-30-

recognition policies and (ii) failure to properly account for uncollectible receivables, each of which was reasonably likely to have a material effect on i2's operating results, which was necessary for a proper understanding and evaluation of the Company's operating performance and an informed investment decision.

### Failure To Account For Uncollectible Receivables

80.    i2's reported financial results were also materially false and misleading because they failed to properly account for uncollectible receivables under GAAP, thereby materially inflating the Company's reported assets and artificially bolstering its balance sheet.  In the years ending December 31, 1999, 2000 and 2001, Defendants caused i2 to report hundreds of millions of dollars in accounts receivables as valuable and collectible assets of the Company:

| Reporting Period | Reported Accounts Receivables | Reserve Provision for "Uncollectibles" | Total Reported Assets | % of Total Reported Assets |
|---|---|---|---|---|
| December 31, 1999 | $158 million | $ 17.5 million | $861 million | 18.3% |
| December 31, 2000 | $298 million | $31 million | $739.241 million | 40% |
| December 31, 2001 | $140 million | $50 million | $538.218 million | 26% |

81.    As demonstrated by the chart above, i2 reported nearly 158 million in account receivables at the end of 1999 representing 18.3% of the Company's total reported assets; $300 million in accounts receivables at the end of 2000, representing 40% of the Company's total reported assets; and in excess of $140 million in accounts receivables at the end of the 2001, representing 26% of the Company's total reported assets.  As of March 22, 2000, the date of the Company's 1999 10-K, however, Defendants knew or recklessly disregarded, for the reasons set forth above, that at least a significant portion of the Company's reported receivables existed as a result of the significant

-31-

problems i2's customers were having in implementing and integrating i2's software products particularized above.  Thus, the accounts receivable were at serious risk of noncollectibility and that the Company's reserves were correspondingly inadequate.



84.     Despite these facts, the Company's financial statements for 1999, 2000 and 2001 failed to reflect this risk of noncollectibility through reserves or charges against income as required by GAAP.  Instead, the Company's reported financial results for 2000 included a mere $31 million "allowance for doubtful accounts."  This allowance, which represented a mere 12% of i2's accounts receivables for each reporting period, was grossly inadequate as it did not reflect the true level of uncollectible receivables on the Company's books.

85.     In this regard, Defendants caused the Company's financial statements during the Class Period to reflect improperly a material overstatement of receivables and earnings and under-reporting of reserves in contravention of the following provisions:

a.      SFAS No. 5, ¶ 8, provides that an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (I) information available prior to issuance of the

financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.

        b.      The uncertainty that generally exists regarding the collectibility of receivables constitutes a contingency within the meaning of SFAS No. 5, ¶ 1. Consequently, estimated bad debt expense must be accrued if it is material, probable, and can be reasonably estimated. The degree to which receivables are impaired may be estimated on the basis of experience, analysis of individual accounts, or reference to appropriate industry averages. The very process of selling on credit, as Defendants did throughout the Class Period, implies that bad debt expenses are probable.

        c.      The requirement for the inclusion of a provision for noncollectible receivables applies to interim financial statements, as indicated by APB Opinion No. 28, ¶ 17, *Interim Financial Reporting*:

> The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount. <u>Examples of such items include . . . allowance for uncollectible accounts</u> . . . [Emphasis added.]

        d.      According to Accounting Research Bulletin 43, Chapter 3, Section A, the objective of providing for reserves against receivables is to assure that, "[a]ccounts receivable net of allowances for uncollectible accounts . . . are effectively stated at the amount of cash estimated as realizable."

      86.      Moreover, the SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Regulation S-X, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the

disclosure contained in the most recent audited financial statements, <u>except that</u>, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred." 17 C.F.R. § 210.10-01.

87.    In addition, FASB Statement of Concepts No. 5 ("CON5") states, "[a]n expense or loss is recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated . . . ."

88.    Despite knowledge that each of the conditions prompting the need to take a charge against income was existent prior to the close of the year 1999, Defendants knowingly or recklessly permitted the Company's balance sheet to reflect $ 158 million in accounts receivables as valuable and collectible assets -- and knowingly or recklessly permitted the Company's financial statements to fail to reflect the write-down or write-off of these receivables -- when they were uncollectible in whole or in substantial part.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

89.    On March 22, 2000, the first day of the Class Period, i2 filed with the SEC and disseminated to i2's shareholders the Company's Form 10-K reporting its audited results for the fourth quarter of 1999 and the year ended December 31, 1999 (the "1999 Form 10-K").

a.    The 1999 Form 10-K falsely stated that under GAAP, revenues for the fourth quarter of 1999 were $571.1 million.

b.    Among the assets falsely listed by the Company in the 1999 Form 10-K were accounts receivable of approximately $ 157.6 million.

c.    The notes to the financial statements in the 1999 Form 10-K falsely stated that:

-34-

Our revenues consist of software license revenues, service revenues and maintenance revenues. Software license revenues consist of sales of software licenses which are recognized in accordance with the American Institute of Certified Public Accountants' Statement of Position ("SOP") 97-2, "Software Revenue Recognition." Under SOP 97-2, software license revenues are recognized upon execution of a contract and delivery of software, provided that the license fee is fixed and determinable, no significant production, modification or customization of the software is required and collection is considered probable by management. As of January 1, 1999, software license revenues are recognized n accordance with SOP 97-2, as modified by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions." Service revenues are primarily derived from fees for implementation, consulting and training services and are recognized as the services are performed. Maintenance revenues are derived from customer support agreements generally entered into in connection with initial license sales and subsequent renewals. Maintenance revenues are recognized ratably over the term of the maintenance period. Payments for maintenance fees are generally made in advance.

90.     On April 18, 2000, i2 issued a press release announcing its financial and operational results for the first quarter ended March 31, 2000. Defendants falsely stated that i2's revenues for the first quarter of 2000 were $186 million, a 58% increase over first quarter 1999's revenue of $118 million.

91.     The financial information contained in the 1999 Form 10-K and April 18, 2000 press release were materially false and misleading as described in paragraphs 44-87, above, because Defendants:

        a.      now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002";

        b.      substantially overstated revenues by pulling a larger percentage of contract revenues into the current quarter than allowed by SOP 97-2;

-35-

        c.     substantially overstated account receivables by failing to particularize shortfalls and bad debt allowances caused by the substantial problems with i2's software implementation and integration.

92.     On May 4, 2000, Defendants filed with the SEC and disseminated to i2's shareholders the Company's 1999 Annual Report. The 1999 Annual Report contained a letter (the "1999 Annual Report Letter") signed by Individual Defendants Sidhu and Brady which "explain[ed] why i2's solutions, coupled with [the Company's] unbeaten track record of execution, constitute[d] the most powerful, comprehensive platform for conducting business over the Internet." Importantly, the 1999 Annual Report Letter cited Nike as one of two examples of i2 customers who were purportedly using and benefitting from i2's TradeMatrix software:

> In addition, for the i2 customer that has already optimized its internal operations, TradeMatrix leverages the customer's previous investment in solutions and enables the company to operate much more effectively in an extended private marketplace. <u>Many of our customers -- like Sun Microsystems and Nike -- are using the TradeMatrix platform to facilitate more efficient collaboration with their private networks of suppliers.</u> [Emphasis added.]

93.     Defendants' statement regarding Nike was materially false and misleading when made. Even though this statement -- written in the present tense -- purported to describe Nike's then-existing use of the TradeMatrix software, at the time the 1999 Annual Report was filed with the SEC and disseminated to i2's shareholders, Nike was not using the software as described and had yet to receive any benefit from i2 software as a result of the material, ongoing integration and implementation problems and delays described in paragraphs 30-36 above which prevented the software from going "live" at Nike until June 2000, well after the above-quoted statement was made. Each of the Defendants had knowledge of these facts which were necessary to make Defendants' statement complete and accurate when made or acted recklessly. Nonetheless, this statement remained uncorrected by Defendants throughout the Class Period, leaving i2 investors with the

materially false and misleading understanding that i2 software had been successfully implemented

at Nike and was purportedly benefitting Nike's operations when that was not true. Indeed, as set

forth below, senior i2 Vice President Terry Turner pointed to Nike again in December 2000, as a

customer that was purportedly benefitting from i2 software, when that was not true.

94.     On May 15, 2000, i2 filed with the SEC its Quarterly Report on Form 10-Q and

repeated the materially false and misleading financial and operational results reported in the April

18, 2000 press release (the "May 2000 10-Q"). The May 2000 10-Q, signed by Individual

Defendants Beecher and Brigham, falsely stated that:

> Our revenues consist of software license revenues, service revenues and maintenance
> revenues. Software license revenues consist of sales of software licenses which are
> recognized in accordance with the American Institute of Certified Public Accountants'
> Statement of Position ("SOP") 97-2, "Software Revenue Recognition." Under SOP 97-2,
> software license revenues are recognized upon execution of a contract and delivery of
> software, provided that the license fee is fixed and determinable, no significant production,
> modification or customization of the software is required and collection is considered
> probable by management. As of January 1, 1999, software license revenues are recognized
> n accordance with SOP 97-2, as modified by SOP 98-9, "Modification of SOP 97-2,
> Software Revenue Recognition with Respect to Certain Transactions." Service revenues are
> primarily derived from fees for implementation, consulting and training services and are
> recognized as the services are performed. Maintenance revenues are derived from customer
> support agreements generally entered into in connection with initial license sales and
> subsequent renewals. Maintenance revenues are recognized ratably over the term of the
> maintenance period. Payments for maintenance fees are generally made in advance.

95.     The May 2000 10-Q also falsely stated that:

> The accompanying unaudited condensed consolidated financial statements reflect all
> adjustments (consisting only of normal recurring entries, except where noted) which, in the
> opinion of management, are necessary for a fair presentation of the results for the interim
> periods presented.

96.     The financial information and statements regarding i2's accounting procedures

contained in the May 2000 Form 10-Q press release were materially false and misleading as

described in paragraphs 44-87, above, because Defendants:

a.      now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002";

b.      substantially overstated revenues by pulling a larger percentage of contract revenues into the current quarter than allowed by SOP 97-2; and

c.      substantially overstated account receivables by failing to particularize shortfalls and bad debt allowances caused by the substantial problems with i2's software implementation and integration.

97.     On July 18, 2000, Defendants held a conference call with securities analysts and investors to discuss the Company's second quarter 2000 performance. Individual Defendants Sidhu, Brady and Beecher, among others from the Company, participated during the conference call on behalf of the Company.  During the conference call, defendant Brady falsely described i2's TradeMatrix software as an "integrated solution" which purportedly differentiated TradeMatrix from other software systems offered by i2's competitors which "struggled" with implementation issues as a result of, inter alia, the limitations of their systems:

> Our competitors in this space, ERP [Enterprise Resource Planning] companies and small marketers alike will struggle with implementation issues and limitations of their database-centric solutions and their inability to model the complex problems required to deliver true value while integrating to the supply chain. The bottom line is this -- i2 is the only company that offers an integrated solution . . . .

[Emphasis added.]

98.     On the same day, i2 issued a press release, in which Defendants falsely reported the Company's financial and operational results for the second quarter ended June 30, 2000.  For the

quarter, Defendants reported revenues of $242.6 million, a 30% increase over the previous quarter

and 84% greater than total revenues of $131.9 million for the second quarter of 1999.

> License revenues on a stand-alone basis for i2 grew 80 percent to $142.7 million, and
> included $5.5 million of previously deferred subscription revenues from business-to-
> business (B2B) marketplace announced last quarter. "Our growth rate accelerated
> due to the further acceptance and adoption of TradeMatrix (TM) for Internet-enabled
> marketplaces," commented Greg Brady, president of i2. "We are now involved in
> over 90 public and private marketplaces. We're winning both individually and on the
> strength of our partners, including IBM and Ariba. i2 booked license revenue from
> 25 marketplace-related transactions in the quarter, making up more than a third of
> the customer contracts in the quarter and over two-thirds of license revenues in the
> quarter."

99.     The financial information contained in the July 18, 2000 press release was materially

false and misleading as described in paragraphs 44-87, above, because Defendants:

a.     now admit that "the Company currently believes that material adjustments to

its previously reported financial results will be required. Accordingly, investors should not rely on

the financial information contained in the Company's annual reports on Form 10-K for the years

ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for

the quarters ended March 31, 1999 through September 30, 2002";

b.     substantially overstated revenues by pulling a larger percentage of contract

revenues into the current quarter than allowed by SOP 97-2;

c.     substantially overstated account receivables by failing to particularize

shortfalls and bad debt allowances caused by the substantial problems with i2's software

implementation and integration.

100.     On August 14, 2000, i2 filed with the SEC its Quarterly Report on Form 10-Q and

repeated the materially false and misleading financial and operational results reported in the July 18,

2000 press release (the "August 2000 Form 10-Q"). The August 2000 Form 10-Q, signed by

Individual Defendants Beecher and Brigham, stated:

Our revenues consist of software license revenues, service revenues and maintenance revenues. Software license revenues consist of sales of software licenses which are recognized in accordance with the American Institute of Certified Public Accountants' Statement of Position SOP 97-2 ("SOP 97-2"), "Software Revenue Recognition," as modified by SOP 98-9. Under SOP 97-2, software license revenues are recognized upon execution of a contract and delivery of software, provided that the license fee is fixed and determinable, no significant production, modification or customization of the software is required and collection is considered probable by management. Service revenues are primarily derived from fees for implementation, consulting and training services and are recognized as the services are performed. Maintenance revenues are derived from customer support agreements generally entered into in connection with initial license sales and subsequent renewals. Maintenance revenues are recognized ratably over the term of the maintenance period. Payments for maintenance fees are generally made in advance.

101. The August 2000 Form 10-Q further falsely stated that

The accompanying unaudited condensed consolidated financial statement reflect all adjustments (consisting of only normal recurring entries, except where noted) which, in the opinion of management, are necessary for a fair presentation of the results for the interim periods presented.

102. The financial information and statements concerning i2's accounting practices contained in the August 2000 Form 10-Q press release was materially false and misleading as described in paragraphs 44-87, above, because Defendants:

a. now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002";

b. substantially overstated revenues by pulling a larger percentage of contract revenues into the current quarter than allowed by SOP 97-2;

c. substantially overstated account receivables by failing to particularize shortfalls and bad debt allowances caused by the substantial problems with i2's software implementation and integration.

103. On October 10, 2000, Defendants held a financial and industry analyst meeting to discuss the Company's products and performance. Individual Defendants Sidhu and Brady, among others from the Company, participated during the meeting on behalf of the Company. During the meeting, defendant Brady responded to reports of claims made by i2's competitors, SAP and Oracle which raised questions about the Company's ability to integrate its software with the existing computer systems of its customers. Brady falsely stated that i2's TradeMatrix software was a planning tool that "for years" had been working with "any back-end transaction system:"

> It's comical to me that SAP and Oracle make big issues out of integration. . . . If you want to do multi-company planning and go after $750 billion, you have to have a planning tool that can work with any back-end transaction system at the exact same time, and that's what our solution has been doing for years. [Emphasis added.]

104. On October 11, 2000, Defendants issued a press release announcing that Kmart had licensed i2's TradeMatrix products "to dramatically transform its supply chain execution, improve customer satisfaction and enhance sales and marketing." In the press release Defendants again falsely described i2's TradeMatrix software as an "integrated" solution. The press release stated, inter alia, that: "The integrated i2 solutions will increase electronic collaboration within Kmart and between Kmart and its business partners." [Emphasis added.]

105. On October 17, 2000, Defendants held a conference call with securities analysts and investors to discuss the Company's third quarter 2000 performance. Defendants Sidhu, Brady and Beecher, among others from the Company, participated during the conference call on behalf of the Company. During the conference call, defendant Brady described the integration capabilities of i2's TradeMatrix software as the "right solutions" for companies and falsely described the software's

-41-

| Date | Shares | Price | | Proceeds | |
|------|--------|-------|---|---------|---|
| 9/10/2001 | 6,456 | $ | 5.62 | $ | 36,305.32 |
| 9/7/2001 | 12,912 | $ | 5.54 | $ | 71,528.61 |
| 9/7/2001 | 12,912 | $ | 5.60 | $ | 72,311.07 |
| 9/7/2001 | 12,912 | $ | 5.54 | $ | 71,528.61 |
| 9/7/2001 | 12,912 | $ | 5.60 | $ | 72,311.07 |
| 9/7/2001 | 6,477 | $ | 5.54 | $ | 35,880.64 |
| 9/7/2001 | 6,456 | $ | 5.60 | $ | 36,155.54 |
| 9/7/2001 | 6,456 | $ | 5.54 | $ | 35,764.30 |
| 9/7/2001 | 6,456 | $ | 5.60 | $ | 36,155.54 |
| 9/6/2001 | 12,912 | $ | 5.60 | $ | 65,356.67 |
| 9/6/2001 | 12,912 | $ | 5.16 | $ | 66,663.36 |
| 9/6/2001 | 12,912 | $ | 5.06 | $ | 65,356.67 |
| 9/6/2001 | 12,912 | $ | 5.16 | $ | 66,663.36 |
| 9/6/2001 | 6,477 | $ | 5.06 | $ | 32,784.63 |
| 9/6/2001 | 6,456 | $ | 5.16 | $ | 33,331.68 |
| 9/6/2001 | 6,456 | $ | 5.06 | $ | 32,678.34 |
| 9/6/2001 | 6,456 | $ | 5.16 | $ | 33,331.68 |
| 9/5/2001 | 12,912 | $ | 5.84 | $ | 75,457.73 |
| 9/5/2001 | 12,912 | $ | 6.39 | $ | 82,543.83 |
| 9/5/2001 | 12,912 | $ | 5.84 | $ | 75,457.73 |
| 9/5/2001 | 12,912 | $ | 6.39 | $ | 82,543.83 |
| 9/5/2001 | 6,456 | $ | 5.84 | $ | 37,728.86 |
| 9/5/2001 | 6,456 | $ | 6.39 | $ | 41,271.92 |
| 9/5/2001 | 6,456 | $ | 5.84 | $ | 37,728.86 |
| 9/5/2001 | 6,456 | $ | 6.39 | $ | 41,271.92 |
| 9/4/2001 | 12,912 | $ | 6.72 | $ | 86,720.87 |

-70-

integration capabilities as being more beneficial than the capabilities offered by SAP, a competing software vendor:

> [SAP] can make an issue out of integration to the ERP system. But, honestly, the integration requirements are changing. We rarely see companies with any and all of their data in one ERP system so the capabilities that i2 have offered around integration are really the right solutions for companies to employ. [Emphasis added.]

106.     Defendants' statements in paragraphs 103-05, above, were materially false and misleading when made. Despite Defendants' repeated claims -- that the Company's software offered a unique, "integration solution" which worked with "any back-end transaction system" and offered "standard integration" to existing computer systems -- i2's software, as set forth in paragraphs 20-43 above, was not an integrated package, but a series of software application programs which had to be individually integrated both with each other and with existing customer software systems in complex and time-consuming manual procedures in order to achieve any of its promised interoperablity. Defendants were each well aware of or recklessly disregarded these facts, disclosure of which was necessary to make Defendants' repeated statements complete and accurate when made. Only after i2's major integration and implementation problems were disclosed by Nike, did Defendants begin to disclose that integration of the Company's software products could be "complex, time-consuming and expensive" as well as unsuccessful. Moreover, as set forth in 20-44 above, as of the time of Defendants' above-quoted statements, i2 had already experienced material, ongoing problems with the integration of i2's TradeMatrix software with numerous customers, including, most importantly, Nike. Defendants knowingly or recklessly failed to disclose such material, adverse results in connection with their above-quoted statements.

107.     On October 17, 2000, i2 issued a press release falsely reporting its financial and operational results for the third quarter ended September 30, 2000. For the quarter, the Company reported revenues of $319.5 million, which were 32 percent higher than the second quarter 2000

revenues of $242.6 million and 118 percent greater than revenues of $146.3 million for the third quarter of 1999.

108.    On November 13, 2000, i2 filed with the SEC its Quarterly Report on Form 10-Q and repeated the materially false and misleading financial and operational results reported in the October 17, 2000 press release. The November 2000 Form 10-Q, signed by Defendants Beecher and Brigham, also falsely stated:

> Our revenues consist of software license revenues, service revenues and maintenance revenues. Software license revenues consist of sales of software licenses, which are recognized in accordance with the American Institute of Certified Public Accountants' Statement of Position SOP 97-2 ("SOP 97-2"), "Software Revenue Recognition," as modified by SOP 98-9. Under SOP 97-2, software license revenues are recognized upon execution of a contract and delivery of software, provided that the license fee is not refundable or subject to forfeiture, no significant production, modification or customization of the software is required and collection is considered probably by management. Subscriptions to access our Content databases are generally recognized ratably over the tem of the subscription period. Service revenues are primarily derived from fees for implementation, consulting and training services and are recognized as the services are performed. Maintenance revenues are derived from customer support agreements generally entered into in connection with initial license sales and subsequent renewals. Maintenance revenues are recognized ratably over the term of the maintenance period. Payment for maintenance fees are generally made in advance.

109.    In addition the November 2000 Form 10-Q further stated:

> The accompanying unaudited interim consolidated financial statements have been prepared in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC"). ...
>
> <u>In the opinion of management, all adjustments (consisting only of normal recurring entries, except where noted) necessary for a fair presentation f the financial position, results of operations and cash flows for the interim periods presented have been made.</u> [Emphasis added.]

110.    The financial information contained in the October 17, 2000 press release and November 2000 Form 10-Q as well as the statements regarding i2's accounting policies and practices

-43-

in the November 2000 Form 10-Q were materially false and misleading as described in paragraphs 44-87 above because Defendants:

    a.    now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required.  Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002";

    b.    substantially overstated revenues by pulling a larger percentage of contract revenues into the current quarter than allowed by SOP 97-2;

    c.    substantially overstated account receivables by failing to particularize shortfalls and bad debt allowances caused by the substantial problems with i2's software implementation and integration.

    111.    On October 23, 2000, defendant Sidhu was quoted in the <u>Business Times</u> as follows:

    Oracle misses the point, in that integration doesn't require that all the application comes from the same vendor.  The market is demanding open integration.  <u>And i2 is a clear leader in this field because we have had a small solution: we offer standard integration to Oracle, SAP, JD Edwards, a variety of other systems.</u> [Emphasis added.]

    112.    Defendant Sidhu's statements quoted in the October 23, 2000 <u>Business Times</u> article were materially false and misleading when made.  Despite Defendants' repeated claims -- that the Company's software offered a unique, "integration solution" which worked with "any back-end transaction system" and offered "standard integration" to existing computer systems -- i2's software, as set forth in paragraphs 20-43 above, was not an integrated package, but a series of software application programs which had to be individually integrated both with each other and with existing customer software systems in complex and time-consuming manual procedures in order to achieve

any of its promised interoperablity.  Defendants were each well aware of or recklessly disregarded these facts, disclosure of which was necessary to make Defendants' repeated statements complete and accurate when made.  Only after i2's major integration and implementation problems were disclosed by Nike, did Defendants begin to disclose that integration of the Company's software products could be "complex, time-consuming and expensive" as well as unsuccessful.  Moreover, as set forth in 20-44 above, as of the time of Defendants' above-quoted statements, i2 had already experienced material, ongoing problems with the integration of i2's TradeMatrix software with numerous customers, including, most importantly, Nike.  Defendants knowingly or recklessly failed to disclose such material, adverse results in connection with their above-quoted statements.

113.    On or about December 4, 2000, Terry Turner, i2's Consumer Goods & Retail Group senior Vice President, participated in a panel held by the American Apparel and Footwear Association at its annual Outlook Seminar.  By the time of this seminar, as described in paragraphs 20-43 above, i2 had already experienced material, ongoing problems with the Nike software implementation which had resulted in severe consequences for Nike.  Nonetheless, as reported by Footwear News on December 11, 2000, Turner publicly discussed the i2-Nike relationship at that time in a highly positive light without disclosing any of the implementation difficulties and adverse results experienced by Nike necessary to make Turner's statements on behalf of the Company complete and accurate when made.  Among other things, Turner stated that footwear retailers and executives must embrace technology to promote efficiency and enhance customer service within their businesses.  With regard to Nike, which Turner described as one of the i2 clients he was personally responsible for, Turner stated that Nike realized that it was stocking the wrong shoe sizes and styles in certain cities and that i2's software was being used by Nike to address such issues: "People wanted lighter color and smaller sizes in Miami and darker colors and larger sizes in

Madison." Turner further stated: "You have to think about your customer base. . . . The magic lies in analyzing things quickly and getting your whole team to understand the value of speed in satisfying customers." According to Turner, technology offered by i2 would help companies quickly process orders and streamline inventory control, allowing companies to return to their main goal, pleasing customers: "They want the right design and assortment, convenient and friendly customer service and the right price compared to quality and the competition." In direct contrast to these statements, the material, undisclosed problems then being caused by i2's software integration problems with Nike resulted in Nike's ordering millions of dollars of poorly selling shoe models and insufficient amounts of models in high customer demand. These omitted facts, which Turner was well aware of given his position in the Company and direct responsibility for i2's Nike account, rendered Turner's statements on behalf of the Company materially incomplete, false and misleading when made. Indeed, at the time of Turner's statements, the Company had already been informed about the material errors its software had caused in Nike's operations and Nike and i2 were attempting to build operational "workarounds" to correct the problems.

114. Following Turner's statements, on or about December 18, 2000, an article appearing in Fortune magazine described i2 stock as "ready to run" and specifically referred to i2's relationship with Nike as an example of i2's purported success. The Fortune article reflected the market's material misunderstanding of the i2-Nike relationship caused by Defendants' repeated, false statements representing that i2's software was purportedly benefitting Nike. Fortune reported: "i2 makes supply-chain management software and other applications. . . . [i]ts software, for example, helps Nike's footwear and apparel units communicate."

115. On January 16, 2001, Defendants issued a press release announcing the availability of a new suite of TradeMatrix products. The press release stated as follows:

-46-

> i2's enhanced solutions streamline how companies do business with their customers, suppliers and supply chain partners, creating significant measurable value.
>
> i2 Technologies Inc., the leading provider of supply chain and marketplace solutions, today announced the availability of an entire suite of solutions designed to optimize each phase of supply chain to transform the way companies do business in the new economy. The solutions enable companies to streamline and transform all key business processes in their value chain -- including customer relationship management, supply chain management and supplier relationship management. i2's collaborative solution suites are supported by the i2 TradeMatrix Platform (TM), which integrates the solutions and provides transaction automation. [Emphasis added.]

116.   On January 17, 2001, Defendants held a conference call with securities analysts and investors to discuss the Company's fourth quarter 2000 performance. Individual Defendants Sidhu, Brady and Beecher, among others from the Company, participated during the conference call on behalf of the Company. During the conference call, defendant Brady (once again) falsely described TradeMatrix's purported ability to integrate with customers' back-end computer systems by stating: "clearly we've proven our ability to implement with just about every architecture in the market place today." (Emphasis added.) Brady went on to state:

> Today [TradeMatrix is] far in a way the most complete and proven solution in the marketplace. It is integrated to every known architecture available today and this is clearly a huge competitive advantage for us. The ability to integrate to any backbone. This is different that some of our competitors who are really limited only to their transaction solutions. [Emphasis added.]

117.   Each of Defendants' statements quoted in paragraphs 111-116, above were materially false and misleading when made. As set forth in paragraphs 20-43, above, TradeMatrix software does not offer an integrated software solution, but a series of software application programs which must be individually integrated both with each other and with existing customer software systems in complex and time-consuming manual procedures in order to achieve any interoperablity. Defendants were each well aware of or recklessly disregarded these facts disclosure of which was necessary to make Defendants' above-quoted statements complete and accurate when made. Only

after i2's major integration and implementation problems were disclosed by Nike, did Defendants begin to disclose that integration of the Company's software products could be "complex, time-consuming and expensive" as well as unsuccessful. Moreover, as set forth in 20-44 above, as of the time of Defendants' above-quoted statements, i2 had already experienced material, ongoing problems with the integration of i2's TradeMatrix software with numerous customers, including, most importantly, Nike. Defendants knowingly or recklessly failed to disclose such material, adverse results in connection with their statements which were necessary to make the statements complete and accurate when made.

118.    On January 8, 2001, i2 issued a press release falsely stating that its "fourth quarter 2000 results are expected to exceed analysts' consensus estimates for revenues and earnings." The press release stated:

> While the Company is still completing its review of results for the quarter, preliminary expectations are to report fourth quarter revenues in excess of $370 million compared to consensus analyst estimates of $342 million, and bringing full-year 2000 revenues to over $1.1 billion. Management expects to report that license revenues for the fourth quarter and full year 2000 more than doubled over the same periods in 1999, due to strong sales of i2's leading e-business solutions. The Company also expect to report that operating income, excluding amortization of intangibles and non-recurring charges, strongly exceeded analysts' consensus estimates of $51 million. [Emphasis added.]

119.    On January 17, 2001, i2 issued a press release reporting its financial and operational results for the fourth quarter and year-ended December 31, 2000. The press release stated:

> The company almost doubled last year's revenues, increasing 97 percent year-over-year, becoming one of the world's largest software companies, with revenues of more than $1.1 billion in 2000. Total quarterly revenues of $378 million were the largest ever reported by i2, growing 116% over 1999 fourth quarter revenues of $175 million.

* * * *

-48-

"As proud as I am of our revenue results and achieving the $1 billion dollar milestone, I'm prouder still of the enormous value we are helping our customers create," said Sanjiv Sidhu, chairman and CEO of i2.

\*\*\*

"Full year revenues shattered the $1 billion goal we set for year 2000 during our IPO in early 1996, when our annual revenues were less than $50 million," said Sidhu. "A combination of strong sales, superior execution, and key acquisitions such as Aspect Development, significant accelerated our revenue growth for the year to 97 percent, from 55 percent growth last year." License revenues more than doubled in 2000, growing 101 percent over 1999. [Emphasis added.]

120.   The financial information contained in the January 8 and January 17, 2001 press releases was materially false and misleading as described in paragraphs 44-87, above, because Defendants:

     a.     now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002";

     b.     substantially overstated revenues by pulling a larger percentage of contract revenues into the current quarter than allowed by SOP 97-2;

     c.     substantially overstated account receivables by failing to particularize shortfalls and bad debt allowances caused by the substantial problems with i2's software implementation and integration.

121.   On February 26, 2001, after the close of the market, the true problems with i2's software began to emerge to the public when Nike issued a press release materially reducing its third quarter 2001 earnings estimate from a previously stated $0.50-$0.55 per share to an expected $0.34-$0.38 per share because of "complications arising from the impact of implementing new demand and

-49-

supply planning systems and processes which resulted in product shortages and excesses as well as late deliveries." Nike also held a conference call on February 26, 2001, during which it explained the extent of its material problems. During the conference call, Donald Blair, Nike's Chief Financial Officer, stated:

> As you know, earlier today we announced that for the third quarter ending February 29, 2001, we expect to earn between $0.34 and $0.38 per share versus the previously stated guidance of $0.50 and $0.55 a share. . . . What we did not anticipate was the additional shortfall resulting from the disruption of our global footwear supply chain caused by a series of events surrounding the implementation of new demand and supply planning systems and processes. These supply chain issues resulted in significant amounts of excess inventory of some footwear models, while other models have been in short supply or delivered late. As a result, our third quarter revenues will be down significantly and our margins will suffer from the high discounts and air freight costs necessary to move the excess inventory through our system. Although we believe we've resolved most of the issues for the Fall of 2001 season which begins shipping in May, it will likely take us 6 to 9 months for the full effect of the Spring 2001 issues to work their way through our system.

Blair went on to state:

> Last year we implemented these new demand planning systems and some attendant changes in process for the global footwear sourcing and initially the software did not perform as we expected and that made it very difficult for us to manage the global buy. And most of that impact has actually fallen into the U.S. because the U.S. operates on tighter time lines than the rest of the world. So disruptions in the supply chain tend to have the most severe impact on the U.S. The implications of the issues were that first of all we had excess product which meant that, as you know the ordering that we do before we have concrete future orders, we did some over-ordering and so we had excess product. In addition, we had some models that had been ordered by customers that we did not place the order on a timely basis with the factory so we had shortage of the product or delays of product which results in lost sales and potentially the need to do some discounting to hold onto that business. And finally, we did have some air freight charges that are required to bring the product and to try to meet what deliveries we could. So that's really what the implications have been of the supply chain issues. As far as timing on how that gets resolved, the major issue in the short term has been the shortages. The biggest impact of the P&L is the losses of revenue and the losses of margin for product that we actually can't deliver. Over a longer period of time, we obviously will need to liquidate our inventory position.

-50-

122.    On February 27, 2001, defendant Sidhu appeared on CNN to respond to questions about Nike's disclosure. Among other things, Sidhu acknowledged that Nike was a "very important" customer of i2; "the implementation wasn't done well"; "the fault for that is not Nike, it is i2's"; and that i2 had been "quite familiar with the issues." An i2 spokesperson was also quoted by Computerworld on February 27, 2001 as stating that it was "a complex and challenging job to get the system implemented at Nike."

123.    Nike's disclosure immediately caused the price of i2 stock to decline. i2 stock opened on February 27, 2001, the first trading day after Nike's announcement and Defendants' response, at $30.19 per share, from a previous close of $35.50 per share on February 26, 2001. By the end of the day, the price of i2 common stock closed at $27.56 per share, down approximately $8 per share, or 22%, from the previous day's closing price of $35.50 per share. Despite the Nike disclosures, however, Defendants continued to violate GAAP.

124.    On February 28, 2001, analyst firm Epoch Partners Research issued a research report on i2 which stated that Nike's disclosure of its problems with i2 software might adversely affect the Company's future performance as it might "lengthen the sales cycles for i2 as would-be customers digest the news and ask more questions." Similarly, analyst firm C.E. Unterberg, Towbin issued a research report on i2 which stated that "the Nike situation may lengthen sales cycles for any large deals."

125.    On March 9, 2001, an article entitled "Beyond Nike: i2's Software Promises Are Hard to Keep," appearing on TheStreet.com, reported that in addition to Nike, i2 had encountered other serious implementation and integration problems:

> According to analysts and other customers of i2, other problems have occurred in the past, and are likely to crop up again, because of the Company's practice of over promising results from complex software that's hard to get right in the first place.

-51-

*   *   *

"It's our belief that [Nike] is another data point where i2 has aggressively sold, but has not delivered equally aggressively," says Lora Cecera also an analyst at Gartner. "They're setting [customers'] expectations without a grounding in how long this is going to take, and what important steps need to be done along the way."

*   *   *

"You can promise a lot of things in a PowerPoint presentation, but it's different to deliver on that promise," said a systems manager at [a global technology company that chose i2's software and subsequently had "a disappointing experience" with it], who asked that he and his company remain anonymous. "We had three or four major requirements that they could not meet at the time, but said they would be able to do for us. We have not had that delivered for us yet."

Because of those problems, the firm has decided to put off its i2 implementation so that it can get other systems in place.

"What we're finding is that we have to go back and separate our ERP [business software] system from i2, because it's slowing us down. It's been 4 ½ years now, and it's been a problem," the manager said.

*   *   *

"The problem is that they oversimplify the install process. It's very complex and time-consuming, and people need to realize that," said the manager [of another company], who also spoke on the condition of anonymity.

The article also noted that the price of i2 common stock was down 39.6% since news "broke about" the Nike situation.

126.   On March 20, 2001, analyst firm Josephthal & Co. Inc. issued a research report concerning i2 which stated that in addition to Nike, there were "other concerns raised surrounding the implementation at Compaq."

127.   On March 29, 2001, i2 filed with the SEC its Annual Report on Form 10-K and reiterated the financial and operational results reported in the January 8 and 17, 2001 press releases. The 2000 Form 10-K, signed by Individual Defendants Sidhu, Beecher and Brigham, stated:

-52-

Revenues consist of software license revenues, service revenues, and maintenance revenues, and are recognized inn accordance with Statement of Position (SOP) 97-2, "Software Revenue Recognition," as modified by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions," and SEC Staff Accounting Bulletin (SAB) 101, "Revenue Recognition."

Software license revenues are recognized upon shipment, provided fees are fixed and determinable and collection is probable. Revenue for agreements that include one or more elements to be delivered at a future date is recognized using the residual method. Under the residual method, the fair value of the undelivered elements is deferred, and the remaining portion of the agreement fee is recognized as revenue. If fair values have not been established for certain undelivered elements, revenue is deferred until those elements have been delivered, or their fair values have been determined. Agreements that include a right to unspecified future elements are recognized ratably over the term of the agreement. License fees from reseller agreements are generally based on the sublicenses granted by the reseller and recognized when the license is sold to the end customer. Licenses to our content databases are recognized over the terms of the agreements. Fees from licenses sold together with services are generally recognized upon shipment, provided fees are fixed and determinable, collection is probable, payment of the license fee is not dependent upon the performance of the consulting services and the consulting services are not essential to the functionality of the licensed software.

Service revenues are primarily derived from fees for implementation, consulting and training services and are generally recognized under service agreements in connection with initial license sales and as the services are performed.

Maintenance revenues are derived from technical support and software updates provided to customers. Maintenance revenue is recognized ratably over the term of the maintenance agreement.

Payments received in advance of revenue recognized are classified as deferred revenue in the Consolidated Balance Sheets.

128. The financial information and statements regarding i2's accounting policies and practices contained in the 2000 Form 10-K were materially false and misleading as described in paragraphs 44-87, above, because Defendants:

a. now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years

ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for

the quarters ended March 31, 1999 through September 30, 2002";

      b.    substantially overstated revenues by pulling a larger percentage of contract

revenues into the current quarter than allowed by SOP 97-2;

      c.    substantially overstated account receivables by failing to particularize

shortfalls and bad debt allowances caused by the substantial problems with i2's software

implementation and integration.

     129.   On April 18, 2001, i2 reported its financial and operational results for the quarter

ended March 31, 2001. For the quarter, the Company reported that total revenues grew 91 percent

to $357 million from $186 million in 2000. Defendant Sidhu commented on the Company's

financial performance, stating, in pertinent part, as follows:

> i2 performed well this quarter despite the beginning of a down cycle in the economy
> . . . . In this slowing economy, where companies are more focused on bottom-line
> results and profitability, our customers are realizing the value and efficiencies i2
> solutions can create for themselves and their trading partners.

     130.   On April 2, 2001, Defendants issued a press release announcing that i2's earnings for

the first quarter of 2001 would be well below analysts' consensus expectations and that the Company

planned to reduce its earnings estimates for the remainder of 2001 and eliminate ten percent of its

workforce. According to the press release, the Company expected to report earnings of only $0.02

per share for the first quarter of 2001 as compared to consensus expectations of $0.06 per share.

Among other things, the press release quoted defendant Sidhu as stating that "some of [i2's]

customers are delaying purchasing decisions." While Defendants also sought to blame a poor

economy for i2's sudden downturn, just four months earlier, defendant Sidhu was quoted in the

Company's January 17, 2001 earnings press release stating that he did not expect i2's products to be

adversely affected by any slowdown in the economy. At that time, Sidhu stated: "We clearly

haven't seen a slowdown in our business so far, and we expect that our value proposition – high ROI (return on investment) and quick payback – positions us as a strategic investment to improve competitiveness even during slower economic growth." Similarly, defendant Beecher was quoted by Bloomberg News on January 18, 2001 as stating: "We are also very effective in a down economy because our value proposition improves the profitability of our customers."

131.     Following Defendants' April 2, 2001 announcement, the price of i2 common stock closed at $13.50 per share on April 3, 2001, a new low closing price for the year, down approximately $2.00 per share, or 13%, from the closing price of $15.43 on April 2, 2001.

132.     Thereafter, on April 18, 2001, Defendants held a conference call with securities analysts and investors to discuss the Company's first quarter 2001 performance. During the call, defendant Sidhu announced that the Company expected to report pro forma losses for both the second and third quarters of 2001, representing the first time since the Company went public that it expected to report losses.

133.     On April 19, 2001 analyst firm US Bancorp Piper issued a research report concerning i2 which stated: "The number of deals closed per productive rep [at i2] is one-half of historic levels with little improvement in sight." Also, on April 19, 2001, analyst firm First Union Securities, Inc. issued a report stating that "an increasing number of [potential i2] customers tend to choose other solutions [from i2's competitors] when initiating more in depth software evaluations such as loading actual customer data for trial runs" and that "an increasing number of potential [i2] customers appear to be looking beyond the [Company's] sales pitch."

134.     On May 3, 2001, analyst firm ABM AMRO Inc. issued a research report on i2 stating that the price of i2 common stock continued to be adversely impacted by "certain customers' concerns, such as Nike and Kmart."

135.    On May 14, 2001, the Industry Standard.com also reported that Kmart was having problems with i2's software products.  The Industry Standard quoted Karen Peterson of the Gartner Group as stating: "The [i2] sales people make bold promises that their software doesn't always live up to."

136.    Also on May 14, 2001, analyst firm Southwest Securities, Inc. issued a research report on i2 which stated that a number of i2 customers had started to express dissatisfaction with i2's software products including Nike, Kmart, Motorola, Seagate and Polo and that raised questions about the Company's overall value.  The report further stated: "Historically, companies have selected i2 for its grand vision and market presence -- today, companies are looking for software vendors with proven value propositions (i.e., quick time-to-value).  Based on customers and [system integrators] we've interviewed, we are not convinced i2 fits this profile."

137.    On June 1, 2001, Computer Reseller News reported that i2 was attempting to simplify the implementation process for its software.

138.    On July 3, 2001, Defendants issued a press release warning that, as a result of poor demand for the Company's software products, i2's second quarter results were expected to be below analysts' already reduced expectations and that the Company expected to report a loss of $2.10 to $2.12 per share for the quarter, or $0.12 per share excluding certain one-time items such as restructuring and bad debt charges.

139.    Following Defendants' press release, analyst firm Josephthal & Co. Inc. issued a research report on i2 noting that the Company's license revenue was at least 25% below reduced consensus expectations and that concerns about i2's recent implementation problems remained.  Similarly, analyst firm Southwest Securities, Inc. issued a research report on i2 following Defendants' July 3, 2001 press release stating its belief that much of the Company's bad debt charges

-56-

concerned failed software applications that were booked and never successfully deployed. The Southwest Securities report also noted that a number of i2's customers were expressing dissatisfaction with i2's solutions, which was bringing the Company's market value into question as well as adversely affecting its existing industry partnerships.

140.    On July 25, 2001, an i2 spokesperson disclosed that i2 was firing 10 percent of its staff, or approximately 587 workers, to reduce costs. Immediately after this disclosure, Analyst Bradley Whitt of Southwest Securities, Inc. was quoted by Bloomberg as stating that i2's latest firings were another negative sign for investors: "If you're cutting your sales force, then you've got to believe your revenues are going to continue to decline."

141.    i2 common stock closed at $8.60 per share on July 25, 2001, a decline of more than 90% from the Class Period high closing price of i2 stock on September 28, 2000, and a decline of more than 75% from the closing price of i2 common stock on February 26, 2001, the closing price of i2 common stock immediately before Nike's announcement.

142.    On May 4, 2001, i2 filed with the SEC its Quarterly Report on Form 10-Q and reiterated the financial and operational results reported on April 18, 2001. The May 2001 Form 10-Q, signed by Defendants Beecher and Brigham, provided the following disclosure with respect to i2's "revenue recognition" accounting policies and practices:

> Revenues consist of software license revenues, service revenues, and maintenance revenues, and are recognized with Statement of Position (SOP) 97-2, "Software Revenue Recognition," as modified by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions," and SEC Staff Accounting Bulletin (SAB) 101, "Revenue Recognition."
>
> Software licensee revenues are recognized upon shipment, provided fees are fixed and determinable and collection is probable. Revenue for agreements that include one or more elements to be delivered at a future date is recognized using the residual method. Under the residual method, the fair value of the undelivered elements is deferred, and the remaining portion of the agreement fee is recognized as license revenue. If fair values have not been established for certain undelivered elements,

revenue is deferred until those elements have been delivered, or their fair values have been determined. Agreements that include a right to unspecified future elements are recognized ratably over the term of the agreement. License fees from reseller agreements are generally based on the sublicenses granted by the reseller and recognized when the license is sold to the end customer. Licenses to our content databases are recognized over the term of the agreements. Fees from licenses sold together with services are generally recognized upon shipment, provided fees are fixed and determinable, collection is probable, payment of the license fee is not dependent upon the performance of the consulting services and the consulting services are not essential to the functionality of the licensed software.

Service revenues are primarily derived from fees for implementation, consulting and training services and are generally recognized as the services are performed under service agreements in connection with initial license sales.

Maintenance revenues are derived from technical support and software updates provided to customers. Maintenance revenue is recognized ratably over the term of the maintenance agreement, generally one year.

Payments received in advance of revenue recognized are classified as deferred revenue in the Consolidated Balance Sheets.

143.    The May 2001 Form 10-Q further stated:

The accompanying condensed consolidated financial statements have been prepared without audit and reflect all adjustments that, in the opinion of management, are necessary to present fairly our financial position at March 31, 2001, and our results of operations and cash flows for the periods presented.

144.    On July 18, 2001, i2 issued a press release reporting its financial and operational

results for the quarter ended June 30, 2001. The press release stated, in pertinent part, as follows:

Total revenues were $241 million, including license revenues of $106 million, compared to total revenues of $243 million, including license revenues of $150 million in the same period a year ago. Financial results for the second quarter of 2000 include the results of operations of Aspect Development from the date of acquisition, June 9, 2000.

Greg Brady, chief executive officer of i2 [stated]. "We are the market leader — we have the best solutions, the best customers, a great track record, the best team and the vision to win. We are focused on executing and positioning i2 for success in the future, such that we make the most of our opportunities when market conditions eventually improve."

145.    On August 14, 2001, i2 filed with the SEC its Quarterly Report on Form 10-Q and reiterated the financial and operational results reported in the July 18, 2001 press release. The August 2001 10-Q, signed by Individual Defendants Beecher and Brigham, stated:

> Revenues consist of software license revenues, service revenues, and maintenance revenues, and are recognized with Statement of Position (SOP) 97-2, "Software Revenue Recognition," as modified by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions," and SEC Staff Accounting Bulletin (SAB) 101, "Revenue Recognition."
>
> Software licensee revenues are recognized upon shipment, provided fees are fixed and determinable and collection is probable. Revenue for agreements that include one or more elements to be delivered at a future date is recognized using the residual method. Under the residual method, the fair value of the undelivered elements is deferred, and the remaining portion of the agreement fee is recognized as license revenue. If fair values have not been established for certain undelivered elements, revenue is deferred until those elements have been delivered, or their fair values have been determined. Agreements that include a right to unspecified future elements are recognized ratably over the term of the agreement. License fees from reseller agreements are generally based on the sublicenses granted by the reseller and recognized when the license is sold to the end customer. Licenses to our content databases are recognized over the term of the agreements. Fees from licenses sold together with services are generally recognized upon shipment, provided fees are fixed and determinable, collection is probable, payment of the license fee is not dependent upon the performance of the consulting services and the consulting services are not essential to the functionality of the licensed software.
>
> Service revenues are primarily derived from fees for implementation, consulting and training services and are generally recognized as the services are performed under service agreements in connection with initial license sales.
>
> Maintenance revenues are derived from technical support and software updates provided to customers. Maintenance revenue is recognized ratably over the term of the maintenance agreement, generally one year.
>
> Payments received in advance of revenue recognized are classified as deferred revenue in the Consolidated Balance Sheets.

146.    The August 2001 Form 10-Q provided the following disclosure with respect to i2's preparation of its financial statements:

> The accompanying condensed consolidated financial statements have been prepared without audit and reflect all adjustments that, in the opinion of management, are

necessary to present fairly our financial position at March 31, 2001, and our results of operations and cash flows for the periods presented.

147.    On October 16, 2001, i2 issued a press release reporting its financial and operational results for the quarter ended September 30, 2001. For the quarter, the Company reported that total revenues of $194 million for the third quarter were down from $241 million in previous quarter, and down from $320 million in third quarter of 2000.

148.    On November 14, 2001, i2 filed with the SEC its Quarterly Report on Form 10-Q and reiterated the financial and operational results reported in the October 16, 2001 press release. The November 2001 Form 10-Q, signed by Individual Defendants Beecher and Becker, stated:

> Revenues consist of software license revenues, service revenues, and maintenance revenues, and are recognized in accordance with Statement of Position (SOP) 97-2, "Software Revenue Recognition," as modified by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions," and SEC Staff Accounting Bulletin (SAB) 101, "Revenue Recognition."
>
> Software license revenues are recognized upon shipment, provided fees are fixed and determinable and collection is probable. Revenue for agreements that include one or more elements to be delivered at a future date is recognized using the residual method. Under the residual method, the fair value of the undelivered elements is deferred, and the remaining portion of the agreement fee is recognized as license revenue. If fair values have not been established for certain undelivered elements, revenue is deferred until those elements have been delivered, or their fair values have been determined. Agreements that include a right to unspecified future products are recognized ratably over the term of the agreement. License fees from reseller agreements are generally based on the sublicenses granted by the reseller and typically recognized when the license is sold to the end customer. Licenses to our content databases are recognized over the term of the agreements. Fees from licenses sold together with services are generally recognized upon shipment, provided fees are fixed and determinable, collection is probable, payment of the license fee is not dependent upon the performance of the consulting services and the consulting services are not essential to the functionality of the licensed software.
>
> Service revenues are primarily derived from fees for implementation, consulting and training services and are generally recognized as the services are performed under service agreements in connection with initial license sales.

Maintenance revenues are derived from technical support and software updates provided to customers. Maintenance revenue is recognized ratably over the term of the maintenance agreement, generally one year.

> Payments received in advance of revenue recognized are classified as deferred revenue in the Consolidated Balance Sheets.

149.    The November 2001 Form 10-Q also stated:

The accompanying condensed consolidated financial statements have been prepared without audit and reflect all adjustments that, in the opinion of management, are necessary to present fairly our financial position as of September 30, 2001, and our results of operations and cash flows for the periods presented.

150.    The financial information and statements regarding i2's accounting procedures contained in the paragraphs 142-149 above, were materially false and misleading as described in paragraphs 44-87, above, because Defendants:

      a.    now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required.  Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002";

      b.    substantially overstated revenues by pulling a larger percentage of contract revenues into the current quarter than allowed by SOP 97-2; and

      c.    substantially overstated account receivables by failing to particularize shortfalls and bad debt allowances caused by the substantial problems with i2's software implementation and integration.

151.    On January 24, 2002, i2 issued a press release reporting its financial and operational results for the fourth quarter and year-ended December 31, 2001.  The press release stated:

Sequential growth in both license revenues and unit sales and effective cost control combined to improve the company's net results, reporting a pro forma loss of $0.08 per share for the fourth quarter compared to a loss of $0.13 per share in the previous quarter and down from a $0.09 pro forma profit per share in the fourth quarter last year. For the full year 2001, i2 reported a pro forma loss per share of $0.36, compared to pro forma earnings per share of $0.26 last year. ...

Under GAAP (Generally Accepted Accounting Principles) reporting standards, the company reported a net loss of $590 million, or $1.40 loss per share for the fourth quarter. This compares to a net loss of $727 million, or $1.80 loss per share, for the same period last year. For the full year 2001, the company reported a net loss of $7.75 billion, or $18.68 loss per share for 2001 with 97 percent of this reported net loss resulting from the amortization and write-down of intangible assets largely associated with the 2000 acquisition of Aspect Development. This compared to a net loss of $1.75 billion, or $4.83 loss per share, for 2000.

**License and Total Revenue**

i2 achieved a 7 percent sequential increase in license revenues from third quarter results to $73 million, down from $244 million in the fourth quarter of 2000. Total fourth quarter revenues of $194 million were on par with third quarter results and down from $378 million in the same period last year. License revenues for the fiscal year 2001 were $458 million, down 35 percent from the prior year. Total revenues for 2001 were $986 million, down 12 percent from 2000 results, a year in which the company reported 97 percent growth.

152.    On April 1, 2002, i2 filed with the SEC its Annual Report on Form 10-K and reiterated the financial and operational results reported in the January 24, 2002 press release (the "2001 Form 10-K"). Signed by Individual Defendants Sidhu, Brady, Beecher and Becker, the 2001 Form 10-K provided the following disclosure with respect to i2's "revenue recognition" accounting policies and practices:

*Revenue Recognition.* Revenues consist of software license revenues, service revenues and maintenance revenues, and are recognized in accordance with Statement of Position (SOP) 97-2, "Software Revenue Recognition," as modified by SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition with Respect to Certain Transactions," and SEC Staff Accounting Bulletin (SAB) 101, "Revenue Recognition."

Software license revenues are recognized upon shipment, provided fees are fixed and determinable and collection is probable. Revenue for agreements that include one or more elements to be delivered at a future date is recognized using the residual

-62-

method. Under the residual method, the fair value of the undelivered elements is deferred, and the remaining portion of the agreement fee is recognized as license revenue. If fair values have not been established for certain undelivered elements, revenue is deferred until those elements have been delivered, or their fair values have been determined. Agreements that include a right to unspecified future products are recognized ratably over the term of the agreement. License fees from reseller agreements are generally based on the sublicenses granted by the reseller and recognized when the license is sold to the end customer. Licenses to our content databases are recognized over the terms of the agreements. License revenues from custom development projects are generally recognized in proportion to the percentage completion of the project. Fees from licenses sold together with services are generally recognized upon shipment, provided fees are fixed and determinable, collection is probable, payment of the license fee is not dependent upon the performance of any related consulting services by us and any such consulting services are not essential to the functionality of the licensed software.

Service revenues are primarily derived from fees for implementation, consulting and training services and are generally recognized under service agreements as the services are performed. Service arrangements are generally contracted in connection with the initial license transaction. Reimbursements received from customers for out-of-pocket expense incurred in connection with providing these services are reported as reductions of expenses incurred in our Consolidated Statement of Operations. A new accounting standard that impacts accounting for such reimbursements will be effective in 2002. See Note 16 - New Accounting Standards.

Maintenance revenues are derived from technical support and software updates provided to customers. Maintenance revenue is recognized ratably over the term of the maintenance agreement.

Payments received in advance of revenue recognized are classified as deferred revenue in the Consolidated Balance Sheets. Royalties associated with third-party software products integrated with our technology are expensed when the products are shipped while commissions payable to affiliates in connection with sales assistance are expensed when the transactions are recognized. Accrued royalties payable totaled $26.6 million and $12.1 million at December 31, 2001 and 2000 while accrued affiliate commissions payable totaled $18.5 million and $28.4 million at those dates.

We generally warrant our products will function substantially in accordance with documentation provided to customers. We accrue for warranty claims on a case-by-case basis; however, due to the unique nature of each claim and lack of a settlement history, estimating the necessary accrual involves an element of uncertainty and future events may cause significant fluctuations.

153.    The financial information and statements regarding i2's accounting procedures contained in the 2001 Form 10-K and January 24, 2002 press release were materially false and misleading as described in paragraphs 44-87, above, because Defendants:

a.    now admit that "the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002";

b.    substantially overstated revenues by pulling a larger percentage of contract revenues into the current quarter than allowed by SOP 97-2; and

c.    substantially overstated account receivables by failing to particularize shortfalls and bad debt allowances caused by the substantial problems with i2's software implementation and integration.

154.    In its public filings for the remainder of 2002, i2 did not correct its materially false and misleading statements regarding revenues and accounts receivable.

155.    On November 14, 2002, i2 filed its Form 10-Q for the quarterly period ended September 30, 2002 (the "November 2002 Form 10-Q"). In the November 2002 Form 10-Q, Defendants, for the first time revealed problems they knew or should have known about i2's accounting processes. The November 2002 Form 10-Q states:

> We and certain members of our board of directors have received a series of communications from two of our former officers containing a variety of allegations generally related to: accounting and revenue recognition; inadequate financial controls; and gross negligence or potential fraud in connection with product and customer problems, acquisitions, public disclosure and other management decisions.
>
> Prior to sending the initial correspondence in the series described above, each of the former officer had made claims against us seeking monetary relief. The claims by

one officer have been settled. The claim by the other officer, in which he alleged that he is entitled to at least $3 million from us arising from our acquisition of his former company, remains unsettled. In addition, we understand that the two former officers are partners in a business venture which may be competitive with us.

Our board of directors directed its audit committee to investigate the initial allegations promptly after they were received. The audit committee, comprised solely of independent directors, engage separate legal and accounting advisors to assist with the investigation. The audit committee completed the investigation and reported its findings to our board of directors in the third quarter of this year. Based on the results of the audit committee's investigation, our board of directors concluded that there were no adjustments necessary to our financial statements, that there were no indications of material deficiencies in our financial controls and that the facts did not support the allegations concerning gross negligence or potential fraud.

In September and October 2002, the two former officers brought additional information to the attention of the audit committee in respect of their prior allegations regarding revenue recognition. <u>A review of this additional information was performed and, as a result of that review, our management believes that the revenue recognition allegations remain unsubstantiated by the additional information.</u> Our Management has preliminarily reviewed its findings with the audit committee which in turn has directed management to review those findings with the separate accounting advisors engaged by the audit committee to investigate the initial allegations. Following such review, the audit committee will receive a report from its separate accounting advisors and, if appropriate, will direct the separate accounting advisors to conduct an additional inquiry and analysis. [Emphasis added.]

156.    Following i2's statements that there was no merit to its former officers' assertions of accounting fraud, i2's stock increased from $1.15 to $1.20 on November 15, 2002, an increase of more than 14%.

157.    On January 27, 2003, i2 announced that:

[T]he audit committee of its board of directors has engaged Deloitte & Touche LLP, the Company's current external auditors, to re-audit the company's financial statements for the years ended December 31, 2000 and 2001. This decision was made at the recommendation of management based on recent information developed during the audit committee's ongoing investigation of certain allegations regarding the company's revenue recognition with respect to certain customer contracts and its financial reporting for those years. This decision was also influenced by the unavailability of Arthur Andersen LLP, the company's external auditor for those years, to consider any restatement that might be necessary. Deloitte & Touche

-65-

replaced Arthur Andersen as the Company's external auditor in the company's external auditor in May 2002. The company has notified the SEC of these allegations, and the staff has opened an informal inquiry into these matter.

As material adjustments to the previously reported financial statements may be required, investors should not rely on the financial information contained in the company's annual reports of Form 10-K for the years ended December 31, 2000 and 2001 or in the company's quarterly reports on Form 10-Q for the quarters ended March 31, 2000 through September 30, 2002 . While there can be no assurance, the company is working towards a goal of having the re-audit of the 2000 and 2001 financial statements, as well as the audit of the 2002 financial statements, completed to allow for the timely filing of the Company's 2002 annual report on Form 10-K. [Emphasis added.]

158.   i2's admission of improper revenue recognition caused i2's stock price to drop sharply, falling $.34 cents, or 27%, to close at $.92 on January 27, 2003.

159.   On March 31, 2003, i2 issued a press release stating that it:

[W]ould delay filing its annual report on Form 10-K for the year ended December 31, 2002. The delay results from the Company's previously announced decision to re-audit its financial statements for the years ended December 31, 2000 and 2001 as well as the Company's recent determination to expand the re-audits to include its financial statements for the year ended December 31, 1999.

While the re-audits have not been completed and i2 cannot be certain of their eventual outcome with regard to amounts or periods affected, the Company currently believes that material adjustments to its previously reported financial results will be required. Accordingly, investors should not rely on the financial information contained in the Company's annual reports on Form 10-K for the years ended December 31, 1999, 2000, and 2001, in the Company's quarterly reports on Form 10-Q for the quarters ended March 31, 1999 through September 30, 2002, or in the Company's preliminary results for the fourth quarter of 2002. [Emphasis added.]

160.   In that press release, i2 also informed the market that it was the "subject of a formal investigation by" the SEC. At the time of the March 31, 2002 press release, the NASD had halted trading in i2 common stock.

## THE INDIVIDUAL DEFENDANTS' MASSIVE STOCK SALES

161. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding i2, their control over, and/or receipt and/or modification of i2's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning i2, participated in the fraudulent scheme alleged herein.

162. While Defendants were issuing false and misleading statements about i2 and its business, the Individual Defendants disposed of $489,102,835.19 of their personally-held stock, greatly benefitting from the artificial inflation in i2's stock price their fraudulent scheme had created. The Individual Defendants Beecher, Brady and Sidhu sold shares during the Class Period as follows:

| William M. Beecher<br>Chief Financial Officer, Vice President | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 1/24/01 | 10,000 | $ 59.72 | $ 597,200.00 |
| 1/24/01 | 11,196 | $ 59.72 | $ 668,625.00 |
| 1/24/01 | 20,000 | $ 59.72 | $ 1,194,400.00 |
| 1/24/01 | 26,804 | $ 59.72 | $ 1,600,735.00 |
| 1/24/01 | 32,000 | $ 59.72 | $ 1,911,040.00 |
| 10/27/00 | 25,000 | $ 167.80 | $ 4,195,000.00 |

-67-

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 10/24/00 | 25,000 | $ 177.65 | $ 4,441,250.00 |
| 8/01/00 | 20,000 | $ 125.06 | $ 2,501,200.00 |
| 5/15/00 | 1,500 | $ 112.00 | $ 168,000.00 |
| 5/12/00 | 2,000 | $ 110.00 | $ 220,000.00 |
| 5/11/00 | 1,000 | $ 100.00 | $ 100,000.00 |
| 5/08/00 | 2,000 | $ 115.00 | $ 230,000.00 |
| 5/05/00 | 4,000 | $ 115.34 | $ 461,360.00 |
| 5/02/00 | 2,000 | $ 125.50 | $ 251,000.00 |
| 4/28/00 | 7,500 | $ 127.11 | $ 953,287.50 |
| 2/11/00 | 4,000 | $ 240.75 | $ 963,000.00 |
| 2/10/00 | 5,000 | $ 245.31 | $ 1,226,562.00 |
| 2/9/00 | 5,000 | $ 232.25 | $ 1,161,250.00 |
| 10/25/99 | 2,000 | $ 60.00 | $ 120,000.00 |
| 10/22/99 | 4,000 | $ 57.50 | $ 230,000.00 |
| 5/18/99 | 4,000 | $ 34.38 | $ 137,500.00 |
| **TOTAL** | | | $ **23,331,409.50** |

| Gregory A. Brady President | | | |
|---|---|---|---|
| Date | Shares | Price | Proceeds |
| 1/23/01 | 280,000 | $ 53.96 | $ 15,108,800.00 |
| 1/23/01 | 120,000 | $ 53.96 | $ 6,475,020.00 |
| 10/23/00 | 90,000 | $ 180.08 | $ 16,207,200.00 |
| 10/23/00 | 110,000 | $ 180.08 | $ 19,808,800.00 |
| 8/07/00 | 50,000 | $ 140.09 | $ 7,004,500.00 |
| 8/03/00 | 10,000 | $ 129.37 | $ 1,293,700.00 |

| Date | Shares | Price | | Proceeds | |
|------|--------|-------|--|---------|--|
| 8/03/00 | 20,000 | $ | 128.88 | $ | 2,577,600.00 |
| 8/03/00 | 100,000 | $ | 124.44 | $ | 12,444,000.00 |
| 7/31/00 | 10,000 | $ | 125.13 | $ | 1,251,250.00 |
| 7/31/00 | 10,000 | $ | 125.00 | $ | 1,250,000.00 |
| 2/25/00 | 20,000 | $ | 150.13 | $ | 3,006,250.00 |
| 2/11/00 | 28,000 | $ | 240.75 | $ | 6,741,000.00 |
| 2/11/00 | 7,000 | $ | 240.75 | $ | 1,685,250.00 |
| 2/8/00 | 5,000 | $ | 235.81 | $ | 1,179,062.00 |
| 10/25/99 | 50,000 | $ | 59.68 | $ | 2,983,750.00 |
| 8/31/99 | 9,000 | $ | 32.11 | $ | 288,990.00 |
| **TOTAL** | | | | $ | **99,305,172.00** |

| Sanjiv S. Sidhu Chief Executive Officer and Chairman | | | | | |
|------|--------|-------|--|---------|--|
| Date | Shares | Price | | Proceeds | |
| 9/17/2001 | 11,245 | $ | 4.75 | $ | 53,390.14 |
| 9/17/2001 | 11,245 | $ | 4.75 | $ | 53,390.14 |
| 9/17/2001 | 6,477 | $ | 4.75 | $ | 30,752.15 |
| 9/17/2001 | 5,623 | $ | 4.75 | $ | 26,697.44 |
| 9/10/2001 | 12,912 | $ | 5.44 | $ | 70,201.25 |
| 9/10/2001 | 12,912 | $ | 5.62 | $ | 72,610.63 |
| 9/10/2001 | 12,912 | $ | 5.44 | $ | 70,201.25 |
| 9/10/2001 | 12,912 | $ | 5.62 | $ | 72,610.63 |
| 9/10/2001 | 6,477 | $ | 5.44 | $ | 35,214.80 |
| 9/10/2001 | 6,456 | $ | 5.62 | $ | 36,305.32 |
| 9/10/2001 | 6,456 | $ | 5.44 | $ | 35,100.63 |

# SCHEDULE "A" TO PLAINTIFFS' SECOND AMENDED COMPLAINT

| Date | Shares | Price | | Proceeds | |
|---|---|---|---|---|---|
| 9/4/2001 | 12,912 | $ | 6.74 | $ | 87,019.13 |
| 9/4/2001 | 12,912 | $ | 6.72 | $ | 86,720.87 |
| 9/4/2001 | 12,912 | $ | 6.74 | $ | 87,019.13 |
| 9/4/2001 | 6,456 | $ | 6.72 | $ | 43,360.43 |
| 9/4/2001 | 6,456 | $ | 6.74 | $ | 43,509.57 |
| 9/4/2001 | 6,456 | $ | 6.72 | $ | 43,360.43 |
| 9/4/2001 | 6,456 | $ | 6.74 | $ | 43,509.57 |
| 8/14/2001 | 12,955 | $ | 8.78 | $ | 113,684.01 |
| 8/14/2001 | 12,955 | $ | 8.81 | $ | 114,185.37 |
| 8/14/2001 | 6,477 | $ | 8.78 | $ | 56,837.62 |
| 8/14/2001 | 6,477 | $ | 8.81 | $ | 57,088.28 |
| 8/13/2001 | 12,955 | $ | 8.78 | $ | 113,744.90 |
| 8/13/2001 | 12,955 | $ | 8.82 | $ | 114,220.35 |
| 8/13/2001 | 6,477 | $ | 8.78 | $ | 56,868.06 |
| 8/13/2001 | 6,477 | $ | 8.82 | $ | 57,105.77 |
| 8/10/2001 | 12,955 | $ | 8.85 | $ | 114,621.95 |
| 8/10/2001 | 12,955 | $ | 8.88 | $ | 115,075.38 |
| 8/10/2001 | 6,477 | $ | 8.85 | $ | 57,306.55 |
| 8/10/2001 | 6,477 | $ | 8.88 | $ | 57,533.25 |
| 8/9/2001 | 12,955 | $ | 8.83 | $ | 114,432.81 |
| 8/9/2001 | 12,955 | $ | 8.91 | $ | 115,442.01 |
| 8/9/2001 | 6,477 | $ | 8.83 | $ | 57,211.99 |
| 8/9/2001 | 6,477 | $ | 8.91 | $ | 57,716.55 |
| 8/8/2001 | 12,955 | $ | 9.13 | $ | 118,242.88 |
| 8/8/2001 | 12,955 | $ | 9.49 | $ | 122,911.86 |
| 8/8/2001 | 6,477 | $ | 9.13 | $ | 59,116.87 |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 8/8/2001 | 6,477 | $ 9.49 | $ 61,451.19 |
| 8/7/2001 | 12,955 | $ 9.83 | $ 127,356.72 |
| 8/7/2001 | 12,955 | $ 9.87 | $ 127,860.67 |
| 8/7/2001 | 6,477 | $ 9.83 | $ 63,673.44 |
| 8/7/2001 | 6,477 | $ 9.87 | $ 63,925.40 |
| 8/6/2001 | 12,955 | $ 9.62 | $ 124,576.58 |
| 8/6/2001 | 12,955 | $ 9.92 | $ 128,491.58 |
| 8/6/2001 | 6,477 | $ 9.62 | $ 62,283.48 |
| 8/6/2001 | 6,477 | $ 9.92 | $ 64,240.83 |
| 8/3/2001 | 12,955 | $ 9.62 | $ 124,689.28 |
| 8/3/2001 | 12,955 | $ 9.72 | $ 125,931.67 |
| 8/3/2001 | 6,477 | $ 9.62 | $ 62,339.83 |
| 8/3/2001 | 6,477 | $ 9.72 | $ 62,960.97 |
| 8/2/2001 | 12,955 | $ 10.17 | $ 131,761.42 |
| 8/2/2001 | 12,955 | $ 10.70 | $ 138,614.61 |
| 8/2/2001 | 6,477 | $ 10.17 | $ 65,875.62 |
| 8/2/2001 | 6,477 | $ 10.70 | $ 69,301.96 |
| 8/1/2001 | 12,955 | $ 9.95 | $ 128,943.71 |
| 8/1/2001 | 12,955 | $ 10.16 | $ 131,609.85 |
| 8/1/2001 | 6,477 | $ 9.95 | $ 64,466.88 |
| 8/1/2001 | 6,477 | $ 10.16 | $ 65,799.84 |
| 7/16/2001 | 12,999 | $ 14.85 | $ 193,052.05 |
| 7/16/2001 | 12,999 | $ 15.04 | $ 195,568.66 |
| 7/16/2001 | 6,499 | $ 14.85 | $ 96,518.60 |
| 7/16/2001 | 6,499 | $ 15.04 | $ 97,776.81 |
| 7/13/2001 | 12,999 | $ 15.13 | $ 196,724.27 |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 7/13/2001 | 12,999 | $ 15.13 | $ 196,738.57 |
| 7/13/2001 | 6,499 | $ 15.13 | $ 98,354.57 |
| 7/13/2001 | 6,499 | $ 15.13 | $ 98,361.72 |
| 7/12/2001 | 12,999 | $ 15.22 | $ 197,851.28 |
| 7/12/2001 | 12,999 | $ 15.48 | $ 201,271.32 |
| 7/12/2001 | 6,499 | $ 15.22 | $ 98,918.03 |
| 7/12/2001 | 6,499 | $ 15.48 | $ 100,627.92 |
| 7/11/2001 | 12,999 | $ 14.20 | $ 184,526.00 |
| 7/11/2001 | 12,999 | $ 14.66 | $ 190,508.14 |
| 7/11/2001 | 6,499 | $ 14.20 | $ 92,255.90 |
| 7/11/2001 | 6,499 | $ 14.66 | $ 95,246.74 |
| 7/10/2001 | 12,999 | $ 15.54 | $ 201,983.66 |
| 7/10/2001 | 12,999 | $ 16.89 | $ 219,564.81 |
| 7/10/2001 | 6,499 | $ 15.54 | $ 100,984.06 |
| 7/10/2001 | 6,499 | $ 16.89 | $ 109,773.96 |
| 7/9/2001 | 12,999 | $ 16.10 | $ 209,283.90 |
| 7/9/2001 | 12,999 | $ 16.43 | $ 213,617.77 |
| 7/9/2001 | 6,499 | $ 16.10 | $ 104,633.90 |
| 7/9/2001 | 6,499 | $ 16.43 | $ 106,800.67 |
| 7/6/2001 | 12,999 | $ 15.49 | $ 201,314.21 |
| 7/6/2001 | 12,999 | $ 15.80 | $ 205,418.00 |
| 7/6/2001 | 6,499 | $ 15.49 | $ 100,649.36 |
| 7/6/2001 | 6,499 | $ 15.80 | $ 102,701.10 |
| 7/5/2001 | 12,999 | $ 16.73 | $ 217,466.77 |
| 7/5/2001 | 12,999 | $ 18.16 | $ 236,098.24 |
| 7/5/2001 | 6,499 | $ 16.73 | $ 108,725.02 |

| Date | Shares | Price | | Proceeds | |
|------|--------|-------|---|----------|---|
| 7/5/2001 | 6,499 | $ | 18.16 | $ | 118,040.04 |
| 7/3/2001 | 12,999 | $ | 17.65 | $ | 229,432.35 |
| 7/3/2001 | 12,999 | $ | 18.16 | $ | 235,998.14 |
| 7/3/2001 | 6,499 | $ | 17.65 | $ | 114,707.35 |
| 7/3/2001 | 6,499 | $ | 18.16 | $ | 117,989.99 |
| 7/2/2001 | 12,999 | $ | 19.04 | $ | 247,454.16 |
| 7/2/2001 | 12,999 | $ | 19.31 | $ | 251,026.29 |
| 7/2/2001 | 6,499 | $ | 19.31 | $ | 125,503.49 |
| 6/14/2001 | 13,042 | $ | 17.78 | $ | 231,864.59 |
| 6/14/2001 | 13,042 | $ | 17.17 | $ | 223,983.31 |
| 6/14/2001 | 6,521 | $ | 17.17 | $ | 111,991.65 |
| 6/14/2001 | 6,521 | $ | 17.78 | $ | 115,932.29 |
| 6/13/2001 | 13,042 | $ | 19.82 | $ | 258,488.53 |
| 6/13/2001 | 13,042 | $ | 21.33 | $ | 278,135.00 |
| 6/13/2001 | 6,521 | $ | 19.82 | $ | 129,244.26 |
| 6/13/2001 | 6,521 | $ | 21.33 | $ | 139,067.50 |
| 6/12/2001 | 13,042 | $ | 20.54 | $ | 267,864.42 |
| 6/12/2001 | 13,042 | $ | 21.33 | $ | 278,145.43 |
| 6/12/2001 | 6,521 | $ | 20.54 | $ | 133,932.21 |
| 6/12/2001 | 6,521 | $ | 21.33 | $ | 139,072.71 |
| 6/11/2001 | 13,042 | $ | 22.24 | $ | 290,084.08 |
| 6/11/2001 | 13,042 | $ | 23.49 | $ | 306,378.75 |
| 6/11/2001 | 6,521 | $ | 22.24 | $ | 145,042.04 |
| 6/11/2001 | 6,521 | $ | 23.49 | $ | 153,189.38 |
| 6/8/2001 | 13,042 | $ | 24.10 | $ | 314,340.89 |
| 6/8/2001 | 13,042 | $ | 24.28 | $ | 316,658.46 |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 6/8/2001 | 6,521 | $ 24.10 | $ 157,170.45 |
| 6/8/2001 | 6,521 | $ 24.28 | $ 158,329.23 |
| 6/7/2001 | 13,042 | $ 22.85 | $ 298,067.08 |
| 6/7/2001 | 13,042 | $ 22.95 | $ 299,332.16 |
| 6/7/2001 | 6,521 | $ 22.85 | $ 149,033.54 |
| 6/7/2001 | 6,521 | $ 22.95 | $ 149,666.08 |
| 6/6/2001 | 13,042 | $ 22.76 | $ 296,786.36 |
| 6/6/2001 | 13,042 | $ 22.83 | $ 297,771.03 |
| 6/6/2001 | 6,521 | $ 22.76 | $ 148,393.18 |
| 6/6/2001 | 6,521 | $ 22.83 | $ 148,885.52 |
| 6/5/2001 | 13,042 | $ 21.10 | $ 275,186.20 |
| 6/5/2001 | 13,042 | $ 21.98 | $ 286,682.72 |
| 6/5/2001 | 6,521 | $ 21.10 | $ 137,593.10 |
| 6/5/2001 | 6,521 | $ 21.98 | $ 143,341.36 |
| 6/4/2001 | 13,042 | $ 20.63 | $ 269,009.51 |
| 6/4/2001 | 13,042 | $ 20.74 | $ 270,538.03 |
| 6/4/2001 | 6,521 | $ 20.63 | $ 134,504.75 |
| 6/4/2001 | 6,521 | $ 20.74 | $ 135,269.02 |
| 6/1/2001 | 13,042 | $ 20.20 | $ 263,440.57 |
| 6/1/2001 | 13,042 | $ 20.60 | $ 268,665.20 |
| 6/1/2001 | 6,521 | $ 20.20 | $ 131,720.29 |
| 6/1/2001 | 6,521 | $ 20.60 | $ 134,332.60 |
| 5/14/2001 | 13,086 | $ 19.14 | $ 250,473.89 |
| 5/14/2001 | 13,086 | $ 19.04 | $ 249,167.91 |
| 5/14/2001 | 6,543 | $ 19.14 | $ 125,236.95 |
| 5/14/2001 | 6,543 | $ 19.04 | $ 124,583.95 |

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 5/11/2001 | 13,086 | $ 19.90 | $ 260,416.63 |
| 5/11/2001 | 13,086 | $ 20.75 | $ 271,564.60 |
| 5/11/2001 | 6,543 | $ 19.90 | $ 130,208.32 |
| 5/11/2001 | 6,543 | $ 20.75 | $ 135,782.30 |
| 5/10/2001 | 13,086 | $ 21.31 | $ 278,829.95 |
| 5/10/2001 | 13,086 | $ 22.20 | $ 290,509.20 |
| 5/10/2001 | 6,543 | $ 21.31 | $ 139,414.97 |
| 5/10/2001 | 6,543 | $ 22.20 | $ 145,254.60 |
| 5/9/2001 | 13,086 | $ 20.97 | $ 274,464.46 |
| 5/9/2001 | 13,086 | $ 21.85 | $ 285,909.47 |
| 5/9/2001 | 6,543 | $ 20.97 | $ 137,232.23 |
| 5/9/2001 | 6,543 | $ 21.85 | $ 142,954.74 |
| 5/8/2001 | 13,086 | $ 22.16 | $ 290,001.46 |
| 5/8/2001 | 13,086 | $ 22.52 | $ 294,665.31 |
| 5/8/2001 | 6,543 | $ 22.16 | $ 145,000.73 |
| 5/8/2001 | 6,543 | $ 22.52 | $ 147,332.66 |
| 5/7/2001 | 13,086 | $ 23.57 | $ 308,376.82 |
| 5/7/2001 | 13,086 | $ 24.57 | $ 321,515.17 |
| 5/7/2001 | 6,543 | $ 23.57 | $ 154,188.41 |
| 5/7/2001 | 6,543 | $ 24.57 | $ 160,757.58 |
| 5/4/2001 | 13,086 | $ 20.58 | $ 269,309.88 |
| 5/4/2001 | 13,086 | $ 21.09 | $ 276,012.53 |
| 5/4/2001 | 6,543 | $ 20.58 | $ 134,654.94 |
| 5/4/2001 | 6,543 | $ 21.09 | $ 138,006.26 |
| 5/3/2001 | 13,086 | $ 20.47 | $ 267,886.12 |
| 5/3/2001 | 13,086 | $ 21.44 | $ 280,600.48 |

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/3/2001 | 6,543 | $ 20.47 | $ 133,943.06 |
| 5/3/2001 | 6,543 | $ 21.44 | $ 140,300.24 |
| 5/2/2001 | 13,086 | $ 19.75 | $ 258,498.23 |
| 5/2/2001 | 13,086 | $ 19.90 | $ 260,423.18 |
| 5/2/2001 | 6,543 | $ 19.75 | $ 129,249.11 |
| 5/2/2001 | 6,543 | $ 19.90 | $ 130,211.59 |
| 5/1/2001 | 13,086 | $ 16.90 | $ 221,141.62 |
| 5/1/2001 | 13,086 | $ 17.24 | $ 225,594.79 |
| 5/1/2001 | 6,543 | $ 16.90 | $ 110,570.81 |
| 5/1/2001 | 6,543 | $ 17.24 | $ 112,797.39 |
| 4/16/2001 | 13,130 | $ 18.86 | $ 247,686.95 |
| 4/16/2001 | 13,130 | $ 19.17 | $ 251,685.03 |
| 4/16/2001 | 6,565 | $ 18.86 | $ 123,843.47 |
| 4/16/2001 | 6,565 | $ 19.17 | $ 125,842.52 |
| 4/12/2001 | 13,130 | $ 18.44 | $ 242,135.58 |
| 4/12/2001 | 13,130 | $ 19.14 | $ 251,338.40 |
| 4/12/2001 | 6,565 | $ 18.44 | $ 121,067.79 |
| 4/12/2001 | 6,565 | $ 19.14 | $ 125,669.20 |
| 4/11/2001 | 13,130 | $ 20.07 | $ 263,481.02 |
| 4/11/2001 | 13,130 | $ 22.06 | $ 289,647.80 |
| 4/11/2001 | 6,565 | $ 20.07 | $ 131,740.51 |
| 4/11/2001 | 6,565 | $ 22.06 | $ 144,823.90 |
| 4/10/2001 | 13,130 | $ 18.85 | $ 247,500.50 |
| 4/10/2001 | 13,130 | $ 20.06 | $ 263,404.87 |
| 4/10/2001 | 6,565 | $ 18.85 | $ 123,750.25 |
| 4/10/2001 | 6,565 | $ 20.06 | $ 131,702.43 |

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 4/9/2001 | 13,130 | $ 17.91 | $ 235,220.01 |
| 4/9/2001 | 13,130 | $ 17.93 | $ 235,460.29 |
| 4/9/2001 | 6,565 | $ 17.91 | $ 117,610.01 |
| 4/9/2001 | 6,565 | $ 17.93 | $ 117,730.15 |
| 4/6/2001 | 13,130 | $ 16.20 | $ 212,762.46 |
| 4/6/2001 | 13,130 | $ 16.47 | $ 216,197.27 |
| 4/6/2001 | 6,565 | $ 16.20 | $ 106,381.23 |
| 4/6/2001 | 6,565 | $ 16.47 | $ 108,098.63 |
| 4/5/2001 | 13,130 | $ 16.56 | $ 217,465.63 |
| 4/5/2001 | 6,565 | $ 16.56 | $ 108,732.81 |
| 4/4/2001 | 13,130 | $ 13.50 | $ 177,255.00 |
| 4/4/2001 | 6,565 | $ 13.50 | $ 88,627.50 |
| 4/3/2001 | 13,130 | $ 14.81 | $ 194,488.13 |
| 4/3/2001 | 6,565 | $ 14.81 | $ 97,244.06 |
| 4/2/2001 | 13,130 | $ 15.06 | $ 197,770.63 |
| 4/2/2001 | 6,565 | $ 15.06 | $ 98,885.31 |
| 2/5/2001 | 105,000 | $ 48.04 | $ 5,043,969.00 |
| 2/5/2001 | 52,000 | $ 48.04 | $ 2,497,965.60 |
| 2/5/2001 | 39,800 | $ 47.99 | $ 1,910,073.64 |
| 2/5/01 | 19,900 | $ 47.99 | $ 955,001.00 |
| 2/5/01 | 39,800 | $ 47.99 | $ 1,910,002.00 |
| 2/5/01 | 105,000 | $ 48.04 | $ 5,044,200.00 |
| 2/5/01 | 52,000 | $ 48.04 | $ 2,498,080.00 |
| 2/2/01 | 17,000 | $ 51.49 | $ 875,330.00 |
| 2/2/01 | 19,900 | $ 50.19 | $ 998,781.00 |
| 2/2/01 | 39,800 | $ 50.19 | $ 1,997,562.00 |

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 2/2/01 | 33,000 | $ 51.49 | $ 1,699,170.00 |
| 2/1/01 | 19,900 | $ 52.97 | $ 1,054,103.00 |
| 2/1/01 | 39,800 | $ 52.97 | $ 2,108,206.00 |
| 2/1/01 | 40,000 | $ 52.85 | $ 2,114,000.00 |
| 2/1/01 | 20,000 | $ 52.85 | $ 1,057,000.00 |
| 1/31/01 | 7,000 | $ 56.25 | $ 393,750.00 |
| 1/31/01 | 19,900 | $ 54.02 | $ 1,074,998.00 |
| 1/31/01 | 39,800 | $ 54.02 | $ 2,149,996.00 |
| 1/31/01 | 13,000 | $ 56.25 | $ 731,250.00 |
| 1/30/01 | 19,900 | $ 55.64 | $ 1,107,236.00 |
| 1/30/01 | 39,800 | $ 55.84 | $ 2,222,432.00 |
| 1/29/01 | 8,000 | $ 57.23 | $ 457,840.00 |
| 1/29/01 | 39,800 | $ 56.87 | $ 2,263,426.00 |
| 1/29/01 | 19,900 | $ 56.87 | $ 1,131,713.00 |
| 1/29/01 | 17,000 | $ 57.23 | $ 972,910.00 |
| 1/26/01 | 17,000 | $ 57.19 | $ 972,230.00 |
| 1/26/01 | 19,900 | $ 55.71 | $ 1,108,629.00 |
| 1/26/01 | 33,000 | $ 57.19 | $ 1,887,270.00 |
| 1/26/01 | 39,800 | $ 55.71 | $ 2,217,258.00 |
| 1/25/01 | 39,800 | $ 58.77 | $ 2,339,046.00 |
| 1/25/01 | 19,900 | $ 58.77 | $ 1,169,523.00 |
| 1/24/01 | 50,000 | $ 59.51 | $ 2,975,500.00 |
| 1/24/01 | 39,800 | $ 59.47 | $ 2,366,906.00 |
| 1/24/01 | 25,000 | $ 59.51 | $ 1,487,750.00 |
| 1/24/01 | 19,900 | $ 59.47 | $ 1,183,453.00 |
| 1/23/01 | 53,000 | $ 54.79 | $ 2,903,870.00 |

| Date | Shares | Price | | Proceeds | |
|------|--------|-------|---|----------|---|
| 1/23/01 | 107,000 | $ | 54.79 | $ | 5,862,530.00 |
| 1/23/01 | 39,800 | $ | 55.37 | $ | 2,203,726.00 |
| 1/23/01 | 19,900 | $ | 55.37 | $ | 1,101,863.00 |
| 11/3/00 | 16,500 | $ | 170.01 | $ | 2,805,165.00 |
| 11/3/00 | 17,000 | $ | 170.01 | $ | 2,890,170.00 |
| 11/2/00 | 15,434 | $ | 171.38 | $ | 2,645,079.00 |
| 11/2/00 | 16,000 | $ | 171.13 | $ | 2,738,080.00 |
| 11/2/00 | 30,866 | $ | 171.38 | $ | 5,289,815.00 |
| 11/2/00 | 16,000 | $ | 171.13 | $ | 2,738,080.00 |
| 11/1/00 | 16,000 | $ | 172.26 | $ | 2,756,160.00 |
| 11/1/00 | 16,000 | $ | 172.26 | $ | 2,756,160.00 |
| 11/1/00 | 14,716 | $ | 173.10 | $ | 2,547,340.00 |
| 11/1/00 | 29,434 | $ | 173.10 | $ | 5,095,025.00 |
| 10/31/00 | 18,000 | $ | 166.15 | $ | 2,990,700.00 |
| 10/31/00 | 10,050 | $ | 165.00 | $ | 1,658,250.00 |
| 10/30/00 | 10,050 | $ | 161.91 | $ | 1,627,196.00 |
| 10/30/00 | 14,000 | $ | 163.11 | $ | 2,283,540.00 |
| 10/27/00 | 20,100 | $ | 166.47 | $ | 3,346,047.00 |
| 10/27/00 | 20,000 | $ | 167.30 | $ | 3,346,000.00 |
| 10/27/00 | 10,050 | $ | 166.47 | $ | 1,673,024.00 |
| 10/26/00 | 10,050 | $ | 158.49 | $ | 1,592,825.00 |
| 10/26/00 | 20,100 | $ | 158.49 | $ | 3,185,649.00 |
| 10/26/00 | 21,000 | $ | 165.92 | $ | 3,484,320.00 |
| 10/25/00 | 10,050 | $ | 172.67 | $ | 1,735,334.00 |
| 10/25/00 | 201,000 | $ | 172.67 | $ | 34,706,670.00 |
| 10/25/00 | 25,000 | $ | 176.05 | $ | 4,401,250.00 |

-80-

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 10/24/00 | 20,100 | $ 178.85 | $ 3,594,885.00 |
| 10/24/00 | 24,000 | $ 179.27 | $ 4,302,480.00 |
| 10/24/00 | 10,050 | $ 178.85 | $ 1,797,443.00 |
| 10/23/00 | 30,000 | $ 182.59 | $ 5,477,700.00 |
| 10/23/00 | 20,100 | $ 185.25 | $ 3,723,525.00 |
| 10/23/00 | 10,005 | $ 185.00 | $ 1,850,925.00 |
| 7/31/00 | 10,000 | $ 126.00 | $ 1,260,000.00 |
| 7/31/00 | 5,000 | $ 122.38 | $ 611,900.00 |
| 7/31/00 | 10,000 | $ 127.13 | $ 1,271,300.00 |
| 7/31/00 | 20,000 | $ 124.14 | $ 2,482,800.00 |
| 7/31/00 | 10,000 | $ 125.25 | $ 1,252,500.00 |
| 7/31/00 | 10,000 | $ 124.50 | $ 1,245,000.00 |
| 7/31/00 | 9,000 | $ 121.50 | $ 1,093,500.00 |
| 7/31/00 | 6,000 | $ 121.75 | $ 730,500.00 |
| 7/31/00 | 5,000 | $ 123.00 | $ 615,000.00 |
| 7/31/00 | 10,000 | $ 124.63 | $ 1,246,300.00 |
| 7/31/00 | 5,000 | $ 123.00 | $ 615,000.00 |
| 7/31/00 | 10,000 | $ 122.00 | $ 1,220,000.00 |
| 7/31/00 | 10,000 | $ 124.14 | $ 1,241,400.00 |
| 7/31/00 | 10,000 | $ 124.00 | $ 1,240,000.00 |
| 7/28/00 | 5,000 | $ 121.88 | $ 609,400.00 |
| 7/28/00 | 10,000 | $ 127.00 | $ 1,270,000.00 |
| 7/28/00 | 5,000 | $ 127.63 | $ 638,150.00 |
| 7/28/00 | 10,000 | $ 121.13 | $ 1,211,300.00 |
| 7/28/00 | 33,500 | $ 121.75 | $ 4,078,625.00 |
| 7/28/00 | 20,000 | $ 121.15 | $ 2,423,000.00 |

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 7/28/00 | 10,000 | $ 121.15 | $ 1,211,500.00 |
| 7/28/00 | 5,000 | $ 127.38 | $ 636,900.00 |
| 7/27/00 | 20,000 | $ 127.50 | $ 2,550,000.00 |
| 7/26/00 | 15,000 | $ 127.25 | $ 1,908,750.00 |
| 7/26/00 | 1,500 | $ 131.00 | $ 196,500.00 |
| 7/25/00 | 59,000 | $ 134.32 | $ 7,924,880.00 |
| 7/25/00 | 31,000 | $ 134.32 | $ 4,163,920.00 |
| 7/24/00 | 35,000 | $ 141.48 | $ 4,951,800.00 |
| 7/24/00 | 23,000 | $ 140.96 | $ 3,242,080.00 |
| 7/24/00 | 15,000 | $ 141.48 | $ 2,122,200.00 |
| 7/24/00 | 12,000 | $ 140.96 | $ 1,691,520.00 |
| 6/30/00 | 6,499 | $ 104.27 | $ 677,622.13 |
| 4/27/00 | 400,000 | $ 113.80 | $ 45,520,880.00 |
| 4/27/00 | 200,000 | $ 113.80 | $ 22,760,440.00 |
| 2/9/00 | 40,000 | $ 232.25 | $ 9,290,000.00 |
| 8/31/99 | 120,000 | $ 31.00 | $ 3,720,000.00 |
| **TOTAL** | | | $ **366,466,253.69** |

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

163.    At all relevant times, the market for i2 common stock was an efficient market for the

following reasons, among others:

(a)    i2 common stock met the requirements for listing, and was listed and actively

traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, i2 filed periodic public reports with the SEC and the

NASD;

-82-

(c)     i2 regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     i2 was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

164.    As a result of the foregoing, the market for i2 common stock promptly digested current information regarding i2 from all publicly available sources and reflected such information in i2's stock price. Under these circumstances, all purchasers of i2 common stock during the Class Period suffered similar injury through their purchase of i2 securities at artificially inflated prices and a presumption of reliance applies.

<u>**NO SAFE HARBOR**</u>

165.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements pleaded in this Complaint as none of the statements was a forward-looking statement. To the extent that any of Defendants' challenged statements during the Class Period is found to be a forward-looking statement, which Lead Plaintiffs believe should not be the case, there were also no meaningful cautionary statements issued by Defendants identifying important factors that could cause actual results to differ materially from those in the challenged statements. In fact, only after i2's major integration and implementation problems were disclosed by Nike, did Defendants add the following cautionary language to their SEC filings:

-83-

IMPLEMENTATION OF OUR PRODUCTS IS COMPLEX, TIME-CONSUMING AND EXPENSIVE AND CUSTOMERS MAY BE UNABLE TO IMPLEMENT OUR PRODUCTS SUCCESSFULLY OR OTHERWISE ACHIEVE THE BENEFITS ATTRIBUTABLE TO OUR PRODUCTS.

Our products must integrate with the many existing computer systems and software programs of our customers. This can be complex, time-consuming and expensive, and may cause delays in the deployment of our products. Our customers may be unable to implement our products successfully or otherwise achieve the benefits attributable to our products.

This disclaimer was not made by Defendants throughout the Class Period and did not appear in connection with any of Defendants' repeated claims during the Class Period regarding the purportedly unique capabilities of i2's TradeMatrix software to integrate with customers' existing computer systems. Alternatively, to the extent that the statutory safe harbor does apply to any statements pleaded herein, Defendants are liable for those materially false and misleading statements because at the time each of those statements was made, the individual speaker knew that the statement was false and misleading, and/or the statement was authorized and/or approved by an executive officer of i2 who knew that the statement was false and misleading when made.

## CLASS ACTION ALLEGATIONS

166.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons or entities who purchased or otherwise acquired i2 common stock between March 22, 2000 and January 27, 2003, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

167.    The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, i2 common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  As of March 20, 2000, i2 had more than 157,000,000 outstanding shares of common stock.  Record owners and other members of the Class may be identified from records maintained by i2 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

168.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

169.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

170.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

        b.    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and products of i2; and

        c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

-85-

171.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### FIRST CLAIM

**Violation Of Section 10(b) Of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants**

172.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

173.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (I) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) enable the Individual Defendants to sell $489,102,835.19 of their personally-held shares of i2 common stock at artificially inflated prices; and (iii) cause plaintiffs and other members of the Class to purchase i2 securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

174.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading; and ©) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for i2 securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Individual Defendants are liable as primary participants in the wrongful and illegal conduct

charged herein and as controlling persons as alleged below. The Company is sued as a primary violator of the securities laws.

175. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of i2 as specified herein.

176. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of i2's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about i2 and its business operations in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of i2 securities during the Class Period.

177. Each of the Individual Defendants' primary liability arises from the following facts: (I) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team; (ii) each of these Defendants, by virtue of his or her responsibilities and activities as a senior officer of the Company was privy to the undisclosed, material facts set forth above about the Company's operations; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and products at all relevant times; and (iv) each of these

-87-

Defendants was aware of the Company's dissemination of information to the investing public which he or she knew or recklessly disregarded was materially false and misleading.

178. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing i2's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and products throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

179. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of i2 securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of i2 publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiffs and the other members of the Class acquired i2 securities during the Class Period at artificially high prices and were damaged thereby.

-88-

180.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that i2 was experiencing, which were not disclosed by Defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their i2 securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

181.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

182.    As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

183.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

184.    The Individual Defendants acted as controlling persons of i2 within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, stock ownership and/or participation in the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend were false and misleading.  The Individual Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

185.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

186.    As set forth above, i2 and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' Lead Counsel as counsel for the certified Class;

(b)    Awarding compensatory damages in favor of plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: May 7, 2003.

Respectfully submitted,

Marc R. Stanley
Texas Bar No. 19046500
Roger L. Mandel
Texas Bar No. 12891750
Martin Woodward
Texas Bar No. 00797693

**STANLEY, MANDEL & IOLA, L.L.P.**
3100 Monticello Avenue, Suite 750
Dallas, TX 75205
214-443-4300
214-443-0358 (fax)

**Liaison Counsel for Plaintiffs**

**MILBERG WEISS BERSHAD
   HYNES & LERACH LLP**
Salvatore J. Graziano
Lawrence D. McCabe
One Pennsylvania Plaza
New York, NY 10119
212-594-5300
212-868-1229 (fax)

**JOHNSON & PERKINSON**
Dennis J. Johnson
D. James Mackall
1690 Williston Road
South Burlington, VT 05403
802-862-0030
802-862-0060 (fax)

**Co-Lead Counsel for Plaintiffs**

**ABRAHAM & PASKOWITZ**
Jeffrey S. Abraham
60 East 42nd Street, Suite 4700
New York, NY 10165

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**
Mel E. Lifshitz
10 East 40th Street
New York, NY 10016

**BRODSKY & SMITH, LLC**
Evan J. Smith
11 Bala Avenue, Suite 39
Bala Cynwyd, PA 19004

**BULL & LIFSHITZ, LLP**
Joshua M. Lifshitz
246 West 38th Street
New York, NY 10018

**CAULEY GELLER BOWMAN
 COATES & RUDMAN LLP**
Paul J. Geller
One Boca Place
2255 Glades Road, Suite 421A
Boca Raton, FL 33431

**THE LAW OFFICE OF LEO W. DESMOND**
Leo W. Desmond
2161 Palm Beach Lakes Blvd., Suite 204
West Palm Beach, FL 33409

**DONOVAN SEARLES LLC**
Michael D. Donovan
1608 Walnut Street, Suite 1400
Philadelphia, PA 19103

**FEDERMAN & SHERWOOD**
William B. Federman
120 North Robinson, Suite 2720
Oklahoma City, OK 73102

**LAW OFFICES OF BRIAN FELGOISE**
Brian Felgoise
261 Old York Road
The Pavilion - Suite 423
Jenkintown, PA 19046

**SCHWARTZ, JUNELL, CAMPBELL &OATHOUT, LLP**
Roger B. Greenberg
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010

**LAW OFFICES OF MARC S. HENZEL**
Marc S. Henzel
210 West Washington Square, Third Floor
Philadelphia, PA 19106

**HOEFFNER & BILEK, L.L.P.**
Thomas E. Bilek
440 Louisiana Street, Suite 720
Houston, TX 77002

**HOLZER & HOLZER**
Corey D. Holzer
6135 Barfield Road, Suite 102
Atlanta, GA 30325

**KILGORE & KILGORE**
Theodore Anderson
3109 Carlisle
Dallas, TX 75204

**KIRBY McINERNEY & SQUIRE, LLP**
Ira M. Press
830 Third Avenue, 10th Floor
New York, NY 10022

**McDONALD, CLAY, CROW
& McGARTLAND, LLP**
Patrick Q. Crow
12222 Merit, Suite 1490
Dallas, TX 75251

**LAW OFFICES OF BRUCE G. MURPHY**
Bruce G. Murphy
265 Llwyds Lane
Vero Beach, FL 32963

**POMERANTZ HAUDEK BLOCK**
 **GROSSMAN & GROSS LLP**
Stanley M. Grossman
100 Park Avenue, 26th Floor
New York, NY 10017

**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
Charles J. Piven
401 East Pratt Street, Suite 2525
Baltimore, MD 21202

**RABIN MURRAY & FRANK, LLP**
Marvin L. Frank
275 Madison Avenue, 34th Floor
New York, NY  10016

**SOPUCH ARNETT HIGGINS & GAUBERT, L.L.P.**
Bryan J. Wick
4650 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201

**STULL STULL & BRODY**
6 East 45th Street
New York, NY 10017

**WECHSLER HARWOOD LLP**
Samuel K. Rosen
488 Madison Avenue, 8th Floor
New York, New York 10022

**WEINSTEIN KITCHENOFF**
 **SCARLATO KARON & GOLDMAN LTD.**
Paul J. Scarlato
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103

**WEISS & YOURMAN**
Kevin J. Yourman
10940 Wilshire Blvd., 24th Floor
Los Angeles, CA 90024

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ**
Fred Taylor Isquith
270 Madison Avenue
New York, NY 10016

**LAW OFFICES OF ALFRED G. YATES, JR.**
Alfred G. Yates Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219

**Attorneys for Plaintiffs**

## SCHEDULE A

### Lead Plaintiffs' Purchases of i2 Common Stock During the Class Period

|  | DATE | SHARES | PRICE |
|---|---|---|---|
| **Philip Anthony:** | 11/20/00 | 5,000 | $140.00 |
|  | 11/20/00 | 5,000 | $140.00 |
|  | 01/30/01 | 8,700 | $ 55.50 |
|  | 01/30/01 | 1,100 | $ 55.45 |
|  | 01/30/01 | 200 | $ 55.44 |
|  | 02/14/01 | 1,000 | $ 52.50 |
|  | 02/20/01 | 8,000 | $ 52.50 |
|  | 02/20/01 | 1,000 | $ 52.50 |
| **Milson Lopes dos Reis:** | 02/07/01 | 5,000 | $ 46.75 |
|  | 02/09/01 | 5,000 | $ 42.13 |
|  | 02/16/01 | 3,000 | $ 38.78 |
|  | 02/16/01 | 3,000 | $ 38.79 |
| **Jack Chehebar:** | 01/26/01 | 1,000 | $ 54.75 |
|  | 02/01/01 | 2,000 | $ 50.84 |
|  | 02/26/01 | 2,000 | $ 27.50 |
| **G.O. Morphew:** | 02/15/01 | 4,500 | $ 42.88 |
|  | 02/15/01 | 500 | $ 42.81 |
|  | 02/15/01 | 3,095 | $ 43.06 |
| **Fredrick W. Bradley:** | 01/30/01 | 2,000 | $ 55.69 |
|  | 02/20/01 | 2,000 | $ 38.13 |

